James **BOELMAN**, Appellant,

v.

**MANSON STATE BANK, Rog–Lee Incorporated, and Roger L. Loerch, Individually and in his Capacity as President of Manson State Bank, Appellees.**

No. 93–675.

Supreme Court of Iowa.

Sept. 21, 1994.

74

Edward N. McConnell and Anthony F. Renzo of Babich, McConnell & Renzo, P.C., Des Moines, for appellant.

Mark R. Crimmins and Brian L. Yung of Bennett, Crimmins & Yung, Fort Dodge, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, LAVORATO, NEUMAN, and TERNUS, JJ.

TERNUS, Justice.

James Boelman brought this action against his former employer and its president claim-

ing his employment had been terminated because of his multiple sclerosis (MS). He based his claims on Iowa's civil rights statute, Iowa Code chapter 601A (1989),[1] and on section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. section 794. The case was tried to the district court as a law action. The court ruled against Boelman on both claims. We affirm because we conclude the district court correctly found that Boelman was not qualified for his job in spite of his disability.

Our review of a disability discrimination claim tried to the court is at law. *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 892 (Iowa 1990). We are bound by the trial court's findings of fact if they are supported by substantial evidence. Iowa R.App.P. 14(f)(1). We view the evidence in the light most favorable to upholding the judgment. *Trobaugh v. Hy–Vee Food Stores*, 392 N.W.2d 154, 156 (Iowa 1986).

I. *Background Facts and Proceedings.*

Roger Loerch, the president of Manson State Bank, hired Boelman in 1984 as a vice president of the bank. Boelman's duties included supervising bank personnel, overseeing bank operations, and handling loans. In 1988 Boelman was diagnosed with probable multiple sclerosis. Although he walked with a noticeable limp, the physical manifestations of his disease remained minor and did not affect his job performance.

During 1988 Boelman regularly saw a psychologist at the recommendation of his physician. The psychologist concluded that Boelman was probably suffering from an adjustment disorder and a depressed mood. He also thought that Boelman had some compulsive personality traits. The psychologist's records revealed that Boelman was stressed and anxious about his personnel responsibilities at the bank and whether Loerch would be satisfied with his handling of these responsibilities. Boelman discussed his concerns about others and how he related to

them with his psychologist. Boelman's medical doctor also treated him for depression and anxiety.

During this time, employees expressed their displeasure with Boelman to Loerch. Their complaints centered on Boelman's personality and attitude rather than his physical problems. In April 1988, Loerch relieved Boelman of his personnel responsibilities. Boelman agreed this was a good idea.

Nevertheless, complaints from Boelman's coemployees persisted through 1988. These complaints continued to focus on Boelman's personal interactions with other employees. Boelman did not get along well with the staff and the staff did not respect him.[2] Loerch spoke with Boelman and the other employees concerning this problem in November 1988. However, Loerch saw no real improvement in Boelman's work performance or his relationship with the other employees. Therefore, Loerch relieved Boelman of his responsibility for operations. Boelman continued to have the title of vice president and his duties as a loan officer.

During this time, Loerch became aware that Boelman was handling a decreasing amount of the bank's loans while Arlen Kirkhart, another bank vice president, was doing an increasing amount of this work. Customers went to Kirkhart because they did not want to work with Boelman. Eventually, Kirkhart was handling ninety percent of the loan work.

In December 1989, Boelman met with Loerch and John Carstens, a semi-retired bank vice president. At this meeting Loerch told Boelman that Loerch could no longer guarantee Boelman's employment at the bank and that Boelman should consider himself a day-to-day employee. Loerch also informed Boelman that Loerch planned to begin a search for Boelman's replacement.

Boelman was discharged in October 1990.

1. Chapter 601A was transferred by the Code editor to chapter 216 in the 1993 Code.

2. The record contains numerous examples of Boelman's conduct and attitude which caused the strained relationship between Boelman and his coemployees. We will not lengthen this opinion with a detailed review of this testimony.

He then sued the bank [3] and Loerch alleging that the defendants fired him because of his MS in violation of Iowa Code chapter 601A and the Rehabilitation Act. In deciding these claims, the district court used the *McDonnell Douglas* pretext analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court held that Boelman had failed to prove a prima facie case of discrimination under chapter 601A and section 504. The court found that because of his MS Boelman was mentally and emotionally unable to handle the job and therefore, he had failed to show he was qualified for the position of vice president. The court also found that no accommodation was available or conceivable in this situation. Additionally, the court found that defendants had set forth a legitimate nondiscriminatory reason for the discharge—Boelman's performance problems—which Boelman failed to rebut. The court concluded Boelman failed to prove he was discharged because of his disability.

On appeal, Boelman claims that (1) the court applied an incorrect legal analysis under chapter 601A and section 504; (2) there was insufficient evidence to support the trial court's finding that a mental condition caused by his MS prevented him from handling his job duties; and (3) the court erred in finding that the defendants could not reasonably accommodate the disability caused by Boelman's MS. We affirm.

## II. *Discriminatory Motive.*

Boelman makes several complaints with respect to the trial court's analysis of and conclusions concerning the bank's motivation for his termination. He claims (1) the trial court should have used a mixed-motive analysis to determine whether the defendants illegally discriminated against him; (2) the evidence established that he was fired, at least in part, because of his MS, unrelated to its effect on his performance; and (3) the court

erred in concluding that he was not terminated because of his disability.

A. *Rehabilitation Act.* Section 504 prohibits discrimination against a "qualified individual" with a disability "solely by reason of" his disability.[4] 29 U.S.C. § 794 (Supp. II 1990).[5] Boelman claims that because the court found his performance problems were causally connected to his MS, it erred in concluding that the defendants did not discharge him because of his disability under section 504. We agree.

■ Where an employer fires an employee based on conduct shown to be causally connected to the employee's disability, the termination is "solely by reason of" the disability for purposes of section 504. *Teahan v. Metro–North Commuter R.R.,* 951 F.2d 511, 515–16 (2d Cir.1991), *cert. denied,* — U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992). Nevertheless, this error by the district court is not a ground for reversal.

■ To establish a claim under section 504, Boelman also had to show that he was "qualified" for his position. *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980, 988 (1979); *Jackson v. Veterans Admin.,* 22 F.3d 277, 278 (11th Cir.1994); *Chandler v. City of Dallas,* 2 F.3d 1385, 1393 (5th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). The trial court found he was not. Because, as we hold later, this finding is supported by substantial evidence, the court's error in holding that the defendants did not discharge Boelman because of his disability was not prejudicial.

B. *Chapter 601A.* In deciding whether Boelman had proved that the defendants discriminated against him, the district court analyzed whether Boelman had proved a prima facie case of discrimination by a preponderance of the evidence. *See Smith v. ADM Feed Corp.,* 456 N.W.2d 378, 385 (Iowa 1990). The court used a pretext analysis. *See Hy-*

---

3. Boelman also sued Rog–Lee Incorporated, a holding company which owned the bank.

4. The Act was amended in 1992 to substitute the term "disability" for the former term "handicap." 29 U.S.C. § 794(a) (West Supp.1994). We will use the new terminology.

5. Section 504 applies only to programs or activities receiving federal financial assistance. 29 U.S.C. § 794. This element of Boelman's section 504 claim is not at issue on appeal.

*Vee Food Stores v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512, 516 (Iowa 1990) (applying *McDonnell Douglas* burden-shifting pretext analysis to a chapter 601A claim). Boelman contends the court should have applied a mixed-motive analysis. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 246–47, 109 S.Ct. 1775, 1799, 104 L.Ed.2d 268, 285 (1989) (applying mixed-motive analysis in title VII case).

■ A mixed-motive analysis is appropriate when the employment decision was "the product of a mixture of legitimate and illegitimate motives." *Id.,* 490 U.S. at 247, 109 S.Ct. at 1788, 104 L.Ed.2d at 285–86; *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993). Once the employee proves a mixed motive, the burden of proof shifts to the employer to show that it would have made the same decision in the absence of the discriminatory motive. *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. at 1788, 104 L.Ed.2d at 284; *Radabaugh,* 997 F.2d at 448.

■ Here Boelman attempted to prove that his termination was based, at least in part, on the mere fact that he had MS, unrelated to its effect on his performance.[6] The defendants claimed that he was fired because of poor performance. The district court found that Boelman's MS caused his performance problems. Consequently, no matter whose version of the facts we accept, Boelman's disability clearly motivated his termination.

Because Boelman's disability was the only reason for his discharge, the facts of this case simply do not show a termination based on mixed motives. The issue here was not whether the defendants would have fired Boelman regardless of his disability. Obviously, they would not have fired him since the only reason they offered for his termination was disability-related. The issue here, as we shall discuss later, was whether

Boelman's disability made him unqualified for his job. Under these circumstances, a mixed-motive analysis is inapplicable.

■ Boelman next argues that the district court erred in concluding that the evidence he introduced showing the defendants fired him because of his "failing health" did not generate a prima facie case under a pretext analysis. As we discuss later, the *McDonnell Douglas* analytical framework is not appropriate for a case such as this where the employer acknowledges reliance on a disability-related reason for its action.

■ Even if a pretext analysis were applicable, it requires Boelman to prove that he was qualified for his job as an element of his prima facie case. *Henkel Corp. v. Iowa Civil Rights Comm'n,* 471 N.W.2d 806, 809 (Iowa 1991). As we discuss next, he failed to prove that he was qualified. Therefore, Boelman did not prove a prima facie case under the *McDonnell Douglas* pretext analysis.

III. *Qualified—Analytical Framework.*

■ A. *Chapter 601A.* In the past, we have placed the burden of proving qualification on the plaintiff as part of a prima facie case under the *McDonnell Douglas* pretext analysis. *E.g., Henkel,* 471 N.W.2d at 810–11; *see Annear v. State,* 454 N.W.2d 869, 872 (Iowa 1990). However, some of our cases suggest that the employer must show that a plaintiff's disability disqualifies the plaintiff for a particular position as part of the employer's "nature of the occupation" defense. *E.g., Smith,* 456 N.W.2d at 385; *Foods, Inc. v. Iowa Civil Rights Comm'n,* 318 N.W.2d 162, 168–69 (Iowa 1982). Most recently, in *Miller v. Sioux Gateway Fire Department,* 497 N.W.2d 838, 841 (Iowa 1993), we left open the question whether the burden of proving qualification in a chapter 601A disability discrimination claim rests on the per-

---

**6.** Boelman introduced evidence that Loerch had altered a memo of the December 1989 meeting between Loerch, Carstens and Boelman. The alteration consisted of the deletion of Boelman's "failing health" as a reason for his discharge. Both Loerch and Carstens disputed that Boelman's failing health was discussed at the meeting or that it played any role in the decision to fire

Boelman. They claimed the memo was corrected to reflect this. The district court resolved this factual issue against Boelman. Loerch's and Carstens' testimony provide substantial evidence to support the trial court's finding that Boelman's failing health, unrelated to his performance problems, did not motivate the defendants.

son claiming discrimination or on the defendant. We answer that question now.

We believe the difficulty in analyzing a disability discrimination claim stems from the fact that the traditional framework used in chapter 601A cases does not fit well. That is because the issue in disability cases is generally not whether the plaintiff was discharged because of his disability but whether the plaintiff's disability and its consequences make the plaintiff unqualified for his position. *Doe v. New York Univ.*, 666 F.2d 761, 776 (2d Cir.1981). Consequently, we take this opportunity to state what we believe is a more workable analysis to use in disability discrimination cases where the discriminatory motive of the employer is not at issue.

■■■ We have previously looked to federal cases interpreting Title VII for guidance in applying chapter 601A. *E.g., King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983) (applying by analogy the same burdens and order of presentation of proof in chapter 601A religious discrimination case as used in title VII cases). The comparable federal statute for disability discrimination claims is section 504 of the Rehabilitation Act. We believe section 504 is sufficiently similar to our chapter 601A that federal cases interpreting section 504 are helpful in determining the appropriate analytical framework for state disability discrimination claims.

Both statutes prohibit discrimination based on a person's disability. Section 504's requirement that the person be qualified for the position from which the person is discharged fulfills the same purpose as chapter 601A's "nature of the occupation" defense in disability cases. *See Brand v. Florida Power Corp.*, 633 So.2d 504, 509 (Fla.Dist.Ct.App. 1994) (holding that section 504's "qualified" language implies a bona fide occupational qualification defense). Chapter 601A requires reasonable accommodation, as does section 504. *Chiari v. City of League City*, 920 F.2d 311, 318 (5th Cir.1991); *Foods, Inc.*, 318 N.W.2d at 169; 45 C.F.R. § 84.12(a) (1993) (employer must accommodate an employee's disability unless "the accommodation

would impose an undue hardship"); 161 Iowa Admin.Code §§ 8.27(6), 8.28 (1993) (an employer of a disabled individual has the obligation to make reasonable accommodations to allow the employee to retain his job where such accommodations do not "impose an undue hardship"). Because of the similarity in section 504 and chapter 601A as it applies to disability discrimination claims, we look to the analytical framework used in section 504 claims in considering Boelman's chapter 601A claim.

Courts interpreting section 504 and similar state statutes have concluded that the analytical framework used to prove a discriminatory motive is unnecessary where the employer relies on the employee's disability in its employment decision. *E.g., Teahan*, 951 F.2d at 516; *Doe*, 666 F.2d at 776; *Pushkin v. Regents of Univ. of Colorado*, 658 F.2d 1372, 1385–86 (10th Cir.1981); *Brand*, 633 So.2d at 509. Therefore, instead of applying the *McDonnell Douglas* prima facie case requirements, courts have replaced or modified the *McDonnell Douglas* analysis with one designed specifically for disability discrimination claims. In cases where the employer relies on disability-related reasons for the discharge, courts require a plaintiff to prove that he or she (1) has a disability; (2) was qualified for the position; and (3) was discharged because of his or her disability. *Jackson*, 22 F.3d at 278; *Chandler*, 2 F.3d at 1390; *Pesterfield v. Tennessee Valley Auth.*, 941 F.2d 437, 441 (6th Cir.1991).[7]

We adopt the same analytical framework for chapter 601A disability discrimination claims where the employer admits reliance on disability-related reasons for the discharge. Therefore, Boelman had the burden to prove that he was qualified for the position from which he was terminated. We turn now to a discussion of how qualification is proved under section 504.

■■■ B. *Rehabilitation Act.* As we have stated, Boelman had to prove he was qualified for the job of vice president in order to

---

7. Of course, the additional element of a section 504 claim, that the plaintiff work for a federally-

financed program or activity, is not relevant to a chapter 601A claim.

establish .his claim under section 504.[8] *Chandler,* 2 F.3d at 1390; *Arenson v. Southern Univ. Law Ctr.,* 911 F.2d 1124, 1127 (5th Cir.1990), *cert. denied,* 499 U.S. 949, 111 S.Ct. 1417, 113 L.Ed.2d 470 (1991). Boelman is qualified if he, with or without reasonable accommodation, "can perform the essential functions of the position in question without endangering the health and safety of [himself] or others...." 29 C.F.R. § 1613.702(f) (1993); *accord School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307, 321 n. 17 (1987).

Thus, to determine whether a person is qualified for a given job, two questions must be answered. First, the fact finder must decide whether the plaintiff could perform the essential functions of the job. *Chandler,* 2 F.3d at 1393. The "essential functions" of the job are those that "bear more than a marginal relationship to the job at issue." *Id.* If the plaintiff proves he can perform the essential functions of the job, then he is qualified.

If the plaintiff cannot perform the essential functions of the job, then the fact finder goes on to the second inquiry— "whether any reasonable accommodation by the employer would enable [the plaintiff] to perform those functions." *Id.* at 1394. At this stage of the analysis, the plaintiff must produce enough evidence to make a facial showing that reasonable accommodation is possible. *Id.* at 1395; *Wood v. Omaha Sch. Dist.,* 985 F.2d 437, 439 (8th Cir.1993).

Upon such a showing, the burden shifts to the employer to prove that it is not able to accommodate the plaintiff's disability or that the proposed accommodation is unreasonable. *Wood,* 985 F.2d at 439. An accommodation is unreasonable if it requires the employer to change the essential nature

of the job or if it places undue burdens on the employer. *Id.*

Here the trial court concluded that Boelman had not proved that he was qualified for his job. Boelman claims there was insufficient evidence to support the court's factual finding that he was not qualified to perform the essential functions of a bank vice president. We now turn to that issue.

IV. *Qualified—Sufficiency of the Evidence.*

A. *Definition of qualified.* We define "a qualified person" for purposes of chapter 601A the same as it is defined under section 504: one who can perform the essential functions of the job "in spite of" his or her disability. *Miller,* 497 N.W.2d at 841. Thus, under both chapter 601A and section 504 Boelman's disability-related performance problems were properly considered by the court in determining whether Boelman was qualified for his position. *Teahan,* 951 F.2d at 515–16. If Boelman's personality and emotional problems resulting from his MS were such that he was not qualified for his job, then his termination is not discriminatory, even though the defendants fired him because of his disability. *Id.* at 516.

B. *Proof of ability to perform.* Boelman does not claim that the ability to deal with coemployees and customers was unnecessary to the performance of the essential responsibilities of his position. Therefore, we only examine whether there was sufficient evidence to support a finding that the symptoms and consequences of Boelman's MS interfered with his ability to work effectively with the staff and customers of the bank.

In discussing Boelman's performance problems, the court concluded that Boelman was not qualified for his job be-

---

8. Some courts have allocated the burden of proof and production of evidence between the employer and employee with respect to qualification. *Doe,* 666 F.2d at 776–77; *Brand,* 633 So.2d at 510–11. Under the analysis used by these courts, the employee must prove he or she was qualified for the job apart from his or her disability. The burden then shifts to the employer to produce evidence that the employee's disability is

relevant to the essential functions of the position. The employee then bears the ultimate burden to prove he or she was qualified in spite of his or her disability. *Doe,* 666 F.2d at 776–77; *Brand,* 633 So.2d at 510–11; *see also Pushkin,* 658 F.2d at 1387 (adopting a somewhat different allocation of the burden of proof). We do not adopt this burden-shifting framework because it is unnecessarily complicated.

cause he suffered from a mental condition caused by his MS. Boelman contends that there was no expert testimony to support a finding that he suffered from a "mental condition."[9]

We reject this argument. Boelman obtained therapy from a psychologist for his personality and emotional problems. Additionally, the physician who treated him for his MS testified Boelman suffered from anxiety and depression. We believe that there was substantial evidence that Boelman suffered from a mental condition.

Moreover, when the court's references to "mental condition" are read in context, it is clear that the court used this term as a way of labeling the set of personality traits and emotional problems Boelman exhibited which prevented him from competently performing the functions of a bank vice president. The court explained that Boelman's job required him to rely almost exclusively on his personality and on his ability to handle stressful situations. The district court found that "Boelman's deteriorating job performance was based upon his inability to mentally and emotionally handle the job." The court also found that Boelman's "relationship with the [bank's] customers and fellow employees had deteriorated over the years to the point where he was no longer an effective employee."

We conclude there was substantial evidence that Boelman had personality and emotional problems and that these problems prevented him from competently performing this job. Therefore, Boelman failed to prove he could perform the essential functions of his position.

■ C. *Reasonable accommodation.* We now consider whether the district court correctly decided that there were no reasonable accommodations that would have al-

lowed Boelman to handle his job. The district court concluded that due to the nature of Boelman's job duties and his performance deficiencies, no accommodation would enable him to perform his job adequately.

Boelman argues that he established a prima facie case and that the defendants failed to prove the bank could not accommodate Boelman's disability. Boelman did introduce evidence that the physical manifestations of his MS could be accommodated. However, the performance problems resulting in his termination were caused by the emotional consequences of his condition, not the physical consequences.

■ Our review of the record reveals no evidence that Boelman's personality and emotional problems could be accommodated short of totally changing his job responsibilities. Neither Iowa nor federal law requires the defendants to change the essential nature of the job in order to accommodate Boelman's deficiencies. *Chiari,* 920 F.2d at 318; *Henkel Corp.,* 471 N.W.2d at 811; *Smith,* 456 N.W.2d at 386; *see Davis,* 442 U.S. at 409–10, 99 S.Ct. at 2368–69, 60 L.Ed.2d at 990.

Boelman failed to make a prima facie showing that reasonable accommodation was possible. Consequently, there was no error in the trial court's conclusion that no accommodation would make Boelman qualified for his position.

V. *Summary.*

To recover under his chapter 601A disability discrimination claim, Boelman had to prove (1) he has a disability; (2) he was qualified for his job; and (3) he was discharged from his job because of his disability. Boelman could meet his burden to prove qualification by proving that he could perform the essential functions of his job with or

---

9. Boelman also claims there is not substantial evidence to support the district court's finding that his mental condition was caused by his MS. Boelman contends that expert testimony was necessary to establish this causal connection. We need not address this issue because even if Boelman is correct, he cannot succeed on his claim. If Boelman's deteriorating work performance was not caused by his MS, then the bank's reliance on his work performance to ter-

minate him cannot be classified as discriminatory. *Golson–El v. Runyon,* 812 F.Supp. 558, 560 (E.D.Pa.), aff'd, 8 F.3d 811 (3d Cir.1993) (where employee's absences were not attributable to her alcoholism, her termination was not based solely on her disability). Because Boelman failed to convince the district court that his MS, unrelated to his performance, motivated his discharge, no other discriminatory reason for his termination exists.

without accommodation. If his ability to do his job depended on reasonable accommodation, then he was required to make a facial showing that reasonable accommodation was possible. At this point, the burden would have shifted to the defendants to show that the suggested accommodation was unreasonable or would constitute an undue hardship.

We conclude there was sufficient evidence to support the trial court's finding that Boelman was not qualified for his job because he could not perform the essential responsibilities of his position and no accommodation was possible. Although the trial court erred in finding that the defendants did not fire Boelman because of his MS, this error was not prejudicial.

The trial court similarly erred in finding that Boelman was not terminated from his job solely because of his disability under section 504. However, this error does not require reversal because Boelman's section 504 claim also fails because he was not qualified for the job.

**AFFIRMED.**