# IN THE COURT OF APPEALS OF IOWA

No. 16-0183
Filed March 8, 2017


**VICKI L. McCREA,**
        Plaintiff-Appellant,

**vs.**

**CITY OF DUBUQUE,**
        Defendant-Appellee.
_____


        Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter, Judge.


        The plaintiff appeals from the district court's ruling following a bench trial, denying her claims against her employer, the City of Dubuque, for retaliation for use of FMLA leave, retaliation for filing civil rights actions, and for failure to accommodate. **AFFIRMED.**



        Emilie J. Roth Richardson of Roth Law Office, P.C., Dubuque, for appellant.

        Les V. Reddick of Kane, Norby & Reddick, P.C., Dubuque, for appellee.


        Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Vicki McCrea appeals from the district court's ruling following a bench trial, denying her claims against her employer, the City of Dubuque, for retaliation for filing complaints with the Iowa Civil Rights Commission (ICRC), retaliation for taking time off work pursuant to the Family and Medical Leave Act (FMLA), and failure to accommodate a disability. McCrea maintains the district court misapplied the law and made errors in its findings of fact. She asks that we reverse the district court's rulings on her claims and remand for the determination of damages.

**I. Background Facts and Proceedings.**

McCrea began working as a secretary for the City in 1990. She worked in two other departments before being hired by the water department in 2003. In her position with the water department, McCrea worked for Robert Green, the water department manager, and her direct supervisor, Jacqueline Johnson, the plant manager. This continued until McCrea was fired in June 2014.

In May 2007, Randy Peck, the City's personnel manager, wrote McCrea a memo that stated, in part, "I know that your work performance is exemplary and I commend you for the professional manner in which you carry out your responsibilities."

Approximately a year later, McCrea received her first written reprimand. On June 6, 2008, Green issued a written memo to McCrea. It stated, "The purpose of this memorandum is to identify your unacceptable work performance." It listed a number of issues, including, "Reporting late to work, socializing on personal cell phone, working on personal tasks at your desk, extended lunch

breaks, and leaving work early." It also stated that McCrea would be required to fill out a daily activity worksheet and a telephone log, and to record her time "by means of the time clock." According to McCrea's undisputed testimony, she was only required to complete the tasks meant to remedy the stated issues until September 2008. At a meeting with Green and Johnson in September, Green "went through [her] log books. He was very happy with [her] performance, told [her she] didn't have to punch in and out anymore, that [she] didn't have to log her work."

In January 2012, Johnson wrote an "affidavit of character" for McCrea to use in her divorce proceedings. In it, Johnson described McCrea as "a valued employee of the city for over 20 years" and "very conscientious, dependable and has always been enthusiastic to help take on special assignments such as volunteering to help with presentations to school children as part of the Every Child Every Promise initiative and being part of the Employee Recognition committee."[1]

In 2012, McCrea both divorced—she separated from her husband in January 2012 and the divorce was finalized in September 2012—and lost her mother to cancer. As the district court found, "Both of those events were emotionally difficult for Vicki, and both caused her to spend some additional time focusing on non-work matters. At some point in 2012, Vicki applied for FMLA leave, and that request was granted." The exact dates are unclear, but from her testimony, it seems McCrea was on FMLA leave from February 7 until March 20,

---

[1] The record reveals Johnson and McCrea were friends at this time. The letter was for use in her divorce proceedings and not written to support McCrea's employment situation.

2012, while her mother was dying. Additionally, following her mother's death in early 2012, McCrea—who was an executor of her mother's estate—took off a number of Thursdays and Fridays in order to travel to the Quad Cities to deal with her mother's estate.

Around the same time, McCrea would complain to Johnson that she felt Green was ignoring her. She gave as an example that Green often did not or would not say "good morning" to her. Green was also complaining to Johnson about McCrea; Green told Johnson he was concerned about McCrea's work performance and how frequently she was away from work. Johnson told McCrea about the comments Green had made and warned her that Green was watching her on the building's surveillance to see when she arrived and left work.

McCrea scheduled a meeting with Peck to discuss the "communication issues" she was having with Green. Peck advised her that she should bring the issues to Green's attention.

Shortly thereafter, in August 2012, McCrea scheduled a meeting with Green, Johnson, and Mike Brekke, a long-term City employee and the water distribution supervisor. At the meeting, McCrea advised everyone that she had "been to human rights and personnel again and they advised that [they] try to work this out and communicate amongst ourselves to, you, know resolve the issues." According to McCrea, Green became angry at the meeting.

In October 2012, Green and McCrea—along with some others—had a meeting regarding "areas of concern" in McCrea's work performance. Green typed notes sometime after the meeting, but a written copy was never provided to McCrea. However, the notes were admitted as an exhibit at trial. According to

the notes and Green's testimony, Green discussed McCrea's work schedule at the meeting because of the "several times" McCrea was five to twenty-five minutes late arriving to work. The notes then indicate McCrea was late on October 31; November 2, 6, and 29; and December 18 and 21, 2012. Additionally, McCrea was expected to take a thirty minute lunch break and thirty minutes "to pick up the mail at city hall." Green noted, "On several occasions, she . . . left the facility at or about 11:30 a.m. for lunch and to pick up the mail at City Hall and [had] not returned until 12:45-1:15 p.m." He also asserted that there were days McCrea did not stop by city hall to get the mail "though taking the extra time allowed during her lunch break." Green listed concerns about McCrea's use of her personal cell phone throughout the day and personal use of City's copier and fax machine, despite being told not to do so. He also asserted that McCrea was both using an improper method for requesting time off (often doing so the day of or simply writing him a note that she had left for the day without getting approval before doing so) and that there were "discrepancies" in her reporting of her hours to payroll.

On January 7, 2013, Green sat down with the city manager, Michael Van Milligen, for the purpose of requesting permission to fire McCrea. Green prepared a four-page memo detailing his reasons for requesting permission—largely a copy of his notes following the October meeting. Van Milligen refused to authorize the termination; he was concerned the incidents had not been documented as they occurred. He told Green to document any incidents going forward. Because of their friendship, Johnson told McCrea about the meeting between Green and Van Milligen.

At that time, Johnson did not feel that McCrea should be fired. Johnson testified, "Some of it was concerns about the disciplinary actions that Bob had— Bob Green had wanted to take with Vicki, that I felt that they were a little stringent because there was no written documentation to begin with." Additionally, in early January 2013, Johnson told the assistant city manager she had concerns Green was dissatisfied with McCrea's work but he was not actually telling McCrea about the issues. Johnson indicated she thought there were other employees whose work performance was worse, but who were not being noticed or disciplined, and noted that Green personally did not like McCrea. Johnson also reported that Green "exhibits bully behavior and actually says he likes to intimidate people."

The next day, January 8, 2013, McCrea sent Peck a letter, claiming her work environment had "greatly impacted [her] anxiety issues over the past three years." She requested to transfer into an open position—account clerk—at the water and resource recovery center "as an accommodation for [her] anxiety." In response, Peck requested a written statement from McCrea's treating physician describing her functional limitations as pertained to her position and "what, if any, accommodations would allow [her] to perform the essential functions of [her] position." McCrea provided Peck a letter from her doctor, which stated:

> [McCrea] has no limitations in performing the essential functions outlined in the job description you provided [of her current position—secretary].
> Her health has been impacted by stress and anxiety this past year due to many variables in her life. She also reports that her work environment has contributed and increased her anxiety. This is due to the relationship between her department manager and herself. The increased stress and anxiety levels have led to a need to increase her medications and the amount of counseling she has been seeking.

> Being in a negative work environment could impact the performance of any employee. [McCrea] is quite capable of performing every essential function outlined in her job description as she has done for the past 22 years with the city as long as she is not in this type of working environment

After receiving the letter from her doctor, Peck called McCrea and told her she would not be receiving the requested transfer. According to his testimony, Peck denied her request because her doctor had stated she had no limitations and was capable of performing the essential functions of the job she was in.

In August, Peck asked the IT department to run a report of McCrea's internet usage for the previous six months because Green felt that McCrea was using an excessive amount of time on non-work-related websites. Once he received the report, Peck agreed that the use of the internet for non-work needs was excessive, but no formal discipline action was taken against McCrea.

In mid-August, while talking to Brekke, McCrea made a comment that "if she goes down, everybody else is going down also." Brekke spoke to Green about the incident, who asked him to write a memo documenting what happened. Brekke eventually did so in October 2013. The memo also noted that McCrea was "distraught and emotional" when she made the comment, and "[h]er tone and body language . . . was very out of line and threatening." Brekke also stated, "There have been times in the past [McCrea] has made comments to me that I feel were out of line and borderline insubordinate."

Also in August, McCrea had a meeting with the assistant city manager and reported that she was having the same issues with Green she had been having in January. She reported she felt Green was looking for a way to fire her and that she felt "she [was] being held to the letter of the law with policies but other

employees [were] not." McCrea also tried to set up a meeting with Peck to discuss the "hostile work environment" she continued to experience.

On September 10, 2013, McCrea filed her first complaint with the ICRC. She claimed discrimination based on sex, her mental disability (anxiety), and retaliation for complaining to the personnel department and city management about her boss. She claimed she had been denied accommodations, the City failed to hire her (based on the denied transfer request), and she had been harassed.

On September 27, Johnson and Green sent McCrea a memo summarizing a discussion that had taken place two days earlier. It stated:

> At approximately 4:00 p.m. on Wednesday, September 25, 2013, we had a discussion about the 2 hours leave time that you had taken on Friday, September 20, 2013. This time was requested at 8:25 a.m. on September 20, 2013 as two hours of vacation time for September 20, 2013. Since this request did not come to my attention until after you had left the facility at 2:00 p.m. on September 20, 2013, I was unable to approve your request; therefore, the time requested will be recorded as two hours of docked time.
> According to the Personnel Manual for Non-Bargaining Unit Employees, "If an employee is absent from work without proper authorization for part or all of a work day, such absence shall be without pay and shall be grounds for disciplinary action. Absence without authorization for a period of two (2) work days shall be regarded as a resignation."
> Please be advised that vacation requests must be approved prior to the date and time of the requested absence.

On December 5, Green and Johnson wrote another memo, which they gave to McCrea in a meeting on December 6, 2013. Its stated purpose was "to remind [her] of [her] responsibility in being punctual for work and the time allowed for lunch and travel to City Hall to deliver and receive mail." The memo listed four dates in July, three in August, and one each in September, October, and

December when McCrea was purportedly late for work. Additionally, it included seven dates when McCrea "returned back from lunch/mail service late." McCrea was instructed to resume using the time clock to monitor her time. Additionally, the memo warned, "Future incidents of a similar nature will result in disciplinary action which could include termination of your employment." McCrea disputes that she was late on some of the listed dates. She also maintains there were times she was late back from lunch and the city hall run due to traffic, being delayed by a train, or being delayed at city hall because picking up the mail took longer than the allotted thirty minutes.

On December 11, McCrea was late to work in the morning. McCrea admits she was late but justified it by stating there was winter weather that caused an accident on her route to work, which then delayed her. Because of her tardiness, she was suspended from work without pay for one day.

McCrea filed her second complaint with the ICRC on January 17, 2014, primarily because of the one-day suspension without pay. She claimed she was being disciplined at work as a result of filing her first complaint.

On February 12, Green and Johnson made a change to the "operation procedure," whereby it was no longer part of McCrea's job duties to "perform the daily errands to city hall." McCrea was still expected to "punch in and out for [her] work shift and lunch break." Other employees of the water department were then required to make the daily city hall run; Green did not track how long the errand took the other employees.

The next day, McCrea filed her lawsuit in the district court.

On at least five occasions in March and April, Johnson sent McCrea memos with requests for information—with copies provided to Green. For example, the March 17 memo stated:

> In your emails dated March 11 and 14, 2014 you stated that you are being shunned by Bob [Green] and me and that the retaliatory hostile environment affects your symptoms. These are serious allegations. Please provide Bob and me with examples of our behavior that are making you feel shunned and creating a retaliatory hostile work environment.
> Please provide this information ·to me by March 25, 2014.

In an April 1 letter from her doctor to the City, the doctor provided that McCrea was "under [her] professional care and [was] therefore unable to attend work from 03/19/2014 through 04/01/2014 and is released to work on 04/02/2014." McCrea was released with restrictions to work no more than four hours on April 2 and 3, and no more than six hour per day April 7-11. The note stated she could return to full-time hours on April 14.

The City approved McCrea's request for FMLA leave on April 3. The same day, McCrea sent Johnson an email saying she believed the memos were harassing and retaliatory, and that she was experiencing major anxiety because of them.

Johnson wrote McCrea another memo on April 3 and one more on April 15.[2]

McCrea provided additional letters from her medical provider on April 18, May 5, and May 20, restricting her hours. The first letter stated McCrea was unable to work from April 1 through April 18 and was released to work on April 19, with limited hours for a short time thereafter. The second letter retroactively

---

[2] McCrea filed an amended petition at law on April 17, 2014.

approved time off work, stating McCrea "ha[d] restrictions for work from 05/05/2014 through 5/20/2014" and was released to work on May 21. The final letter provided work restrictions for McCrea from May 20 to June 6. She was to be reevaluated again on June 6.

It is unclear how many or which days McCrea worked between her approval for FMLA leave and May 6. When she came into work on May 6, she found several memos on her desk—possibly the ones written on April 3 and April 15. There were also questions about twenty-five dollars in petty cash that McCrea had already returned—with the entire program having already been shut down. After McCrea saw the memos on her desk, she confronted Green. Coworkers testified McCrea was visibly upset, and at least one stated she was crying at the time. McCrea raised her voice at Green, stating, "This is harassment. You need to back off or else. Leave me alone. You've been trying to get rid of me for five years, just do it. Do you know what blood pressure is?"[3] According to McCrea, she also stated to Green, "This is killing me." McCrea then stated that she was leaving for the day due to her anxiety.

Between May 6 and June 5—the day she ultimately terminated from her job with the City—no precautions or actions were taken against McCrea. She was not suspended and her security badge was not taken. It does not appear that McCrea ever returned to work between May 6 and June 5, but Johnson and Green testified that she was still an employee at that time, and she had not been

---

[3] It is disputed whether McCrea stated "You need to back off" or "You need to back off or else." McCrea and at least one coworker testified she stated, "You need to back off." Green testified, and wrote in notes taken after the incident, that McCrea had stated, "You need to back off or else."

told not to return. The City had a written policy on "workplace threats and violence," which stated "threats, threatening behavior or acts of violence against employees" "will not be tolerated." Additionally, "Any person who makes substantial threats, exhibits threatening behavior, or engages in violence acts on City property shall be removed from the premises as quickly as safety permits, and shall remain off City premises pending the outcome of an investigation. The City will initiate an appropriate response."

On May 30, Peck sent McCrea a letter asking her to meet with him at city hall on June 5 to "discuss [her] performance." On that date, Peck had a short meeting with McCrea, where he handed her a letter stating she was being terminated, effective that day. The letter stated, in part, "You are an at-will employee and can be terminated for any reason or no reason at all. Over the last several years you have been insubordinate, failed to properly perform your duties, created a hostile work environment and made threatening statements to your supervisor."

The matter proceeded to a bench trial on October 13, 2015.[4] At the beginning of the trial, McCrea voluntarily dismissed three of her six claims; McCrea dismissed a claim of harassment, failure to hire, and disability discrimination. The trial moved forward on the remaining issues of retaliation for filing complaints with the ICRC, retaliation for using FMLA leave, and failure to accommodate.[5]

---

[4] McCrea had filed a second amended petition at law on April 13, 2015.

[5] We note that a plaintiff does not have to prove an underlying discrimination claim in order to be successful in establishing that she has been retaliated against for filing that claim. *See Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006) ("[A] retaliatory

At trial, Peck testified that "ultimately [McCrea] was fired for threatening her supervisor." He admitted that no adverse actions were immediately taken after the May 6 incident because they did not believe it was "imminent that [McCrea] would deliver on that threat." There had been an employee who had made threats before and the City had followed the written policy in that instance.

Green testified it was his understanding that McCrea was fired for "[t]hreats in the workplace [and] insubordination."

Johnson testified that she agreed with Green that McCrea should be terminated in June 2014. She believed it was appropriate because "of the threats that she made towards [Green] and her belligerent behavior in the workplace and then not addressing any of the things that we had asked her to address."

The district court issued its ruling in December 2015. "The court [was] not at all convinced" by the City's claims McCrea was fired due to "poor work performance." Similarly, the court "[was] also not convinced" by "the City['s] claims [McCrea] was fired because she threatened Robert Green."[6] However, the court ultimately determined that each of McCrea's claims failed. It ruled that McCrea had failed to prove she had a disability, an element of the failure to accommodate claim, and denied both of her retaliation claims.

McCrea appeals.

discharge claim under both the ICRA and Title VII requires that the plaintiff prove three elements, all of which are distinct from any claim of sexual harassment. . . . Even though [the plaintiff's] hostile-work-environment claim failed in the original trial, [the plaintiff] still presented enough evidence to warrant a decision on her retaliatory discharge claim.").

[6] While the district court devoted much of its opinion to criticisms of the credibility of the City's witnesses, we read the opinion as finding McCrea failed to prove a prima facie case.

**II. Standard of Review.**

We review discrimination claims tried to the court for correction of errors at law. *Lynch v. City of Des Moines*, 454 N.W.2d 827, 829 (Iowa 1990). "The district court's findings of fact are entitled to the weight of a special verdict and are binding on appeal if supported by substantial evidence." *Id.*

**III. Discussion.**

**A. Retaliation under the Iowa Civil Rights Act.**

Title VII of the Civil Rights Act of 1964 was "designed to ensure equal opportunity in employment for all, regardless of sex." *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 677 (Iowa 2004). The Iowa Civil Rights Act (ICRA) was modeled after Title VII, so our courts "have consistently employed federal analysis when interpreting the ICRA." *Id.* at 677–78. "Nonetheless, the decisions of federal courts interpreting Title VII are not binding upon us in interpreting similar provisions in the ICRA." *Id.* at 678.

McCrea maintains the district court erred in its application of the law under the ICRA and, in doing so, it wrongly determined the City did not retaliate against her for filing complaints with the ICRC. She asserts that because she filed complaints with the ICRC, the City suspended her from work without pay, issued meritless formal disciplinary actions, and then ultimately terminated her employment.

The district court ruled against McCrea's retaliation claim, stating that because she was unsuccessful in proving that she had a disability, she could not sustain a claim for retaliation. This is an erroneous reading of the law. To sustain a claim for retaliation, McCrea is not required to show that the conduct

she opposed by filing her complaint was in fact discriminatory. *See Hicks v. St. Mary's Honor Ctr.*, 90 F.3d 285, 292 (8th Cir. 1996). Rather, "the plaintiff 'must demonstrate a good faith, reasonable belief that the underlying challenged action violated the law.'" *Id.* (citation omitted). Because McCrea's underlying complaints were based on a good faith belief that she was being discriminated against, we consider whether she can establish the prima facie case for retaliation.

To establish a prima facie case, McCrea has the burden to show: "(1) the plaintiff engaged in protected activity; (2) the employer took adverse employment action against the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action."[7] *See Harris*, 679 N.W.2d at 678. Establishing the prima facie cause "is a minimal requirement that is not as onerous as the ultimate burden to prove" retaliation. *Smidt v. Porter*, 695 N.W.2d 9, 14 (Iowa 2005). That being said, the "causal connection" requirement is a high standard. *See City of Hampton v. Iowa Civil Rights Comm'n*, 554 N.W.2d 532, 535 (Iowa 1996). "[T[he filing of the [complaint] must be a substantial factor prompting the termination. In other words, the protection afforded by anti-retaliatory legislation does not immunize the complainant from discharge for past or present inadequacies, unsatisfactory performance, or insubordination." *Id.* at 335–36 (quoting *Hulme v. Barrett*, 480 N.W.2d 40, 42 (Iowa 1992)).

---

[7] McCrea could also establish her claim by presenting direct evidence that the termination of her employment was in retaliation. *See Wilson v. City of Des Moines*, 338 F. Supp. 2d 1008, 1026 (S.D. Iowa 2004). However, we note she has invoked the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

"Establishment of the prima facie case in effect creates a presumption that the employer unlawfully [retaliated] against the employee." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Thus, "the burden shifts to the [City] to offer a legitimate nondiscriminatory reason for the termination." *Smidt*, 695 N.W.2d at 15. "This is a burden of production, not persuasion, and no credibility assessment is involved." *Id.* "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254.

"If the [City] offers a legitimate nondiscriminatory reason, [McCrea] must show the [City's] reasons was pretextual and that unlawful discrimination was the real reason for the termination." *Smidt*, 695 N.W.2d at 15; *see also Burdine*, 450 U.S. at 253 ("[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."). "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. 804–05).

While the City does not explicitly concede as such, it also does not dispute that McCrea engaged in a protected activity when she filed complaints with the ICRC on September 11, 2013 and January 17, 2014. *See* Iowa Code § 216.11(2) (2014) (providing it is "an unfair or discriminatory practice for . . . [a]ny person to discriminate or retaliate against another person . . . because such

person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or *has filed a complaint*, testified, or assisted in any proceeding under this chapter" (emphasis added)); *see also Fisher v. Elec. Data Sys.*, 278 F. Supp. 2d 980, 993 (S.D. Iowa 2003) (stating "it is clear" that an employee's complaint about harassment "is a 'protected activity'"). Similarly, the City does not argue that the ultimate firing of McCrea from employment with the City was not "adverse employment action." *See, e.g.*, *Fisher*, 278 F. Supp. 2d at 993 (considering termination as the adverse employment action). Rather, the City maintains McCrea's prima facie showing fails because she cannot establish a causal connection between the two.

In deciding whether a causal connection exists between the protected activity and the adverse employment action, we consider a number of things. First, "[a]n employee can establish a causal link between her protected activity and the adverse employment action through 'the time of the two events.'" *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (citation omitted). "A pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement." *Id.* (citation omitted). However, the "mere coincidence of time" "is rarely sufficient to establish the causation element." *Id.* We will also consider any discriminatory comments made by the employer. *Id.* McCrea may "attempt to 'shorten the gap between her protected activity and the adverse action by showing that shortly after she [engaged in the protected activity, the employer] took escalating adverse and retaliatory action against her.'" *Id.* (alteration in original) (quoting *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 503 (8th Cir. 2005)).

Here, McCrea has failed to establish a causal connection between the filing of her complaints and the ultimate action of termination. She filed complaints on September 11, 2013 and January 17, 2014, however, she was not fired until June 5, 2014—almost nine months after her first complaint. *See Wallace v. Sparks Health Sys.*, 415 F.3d 853, 859 (8th Cir. 2005) (holding a one-year lapse between the protected activity and the adverse employment action was "insufficient to show, and in fact weakens the showing of, the required causal link"); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing cases in which a three-month and fourth month periods were insufficient to establish the causal link). In the meantime, she continued to work at the same job, for the same pay.[8] We acknowledge McCrea's argument that the relative inaction of the City before the filing of her first complaint in September 2013, coupled with the City's actions following the filing of her second complaint in January 2014, demonstrated an escalating concern about McCrea's work performance, timeliness, and focus on personal matters following the second

---

[8] We acknowledge one of her duties was removed in February 2014, when McCrea was told that she would no longer be "making the City Hall run" each day. This consisted of leaving the office each day for one half-hour in order to take paperwork to City Hall. One of the City employees testified it was taken away from McCrea because she was often going over the allotted time to complete the task and it was believed someone else could do it more efficiently. While McCrea certainly seemed to take this reduction in duties as a slight, we do not believe this change constituted an adverse employment action, and McCrea never pled it as such. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 71 (2006) (stating "reassignment of job duties is not automatically actionable" and "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances;'" and holding reassignment was actionable where the new duties were "more arduous and dirtier," required fewer qualifications, and was considered a lesser job by other employees).

complaint. However, this escalation is not causally connected to McCrea's protected activity.

The documentation of the concerns increased after McCrea filed her complaint, but the issues themselves were not new, and McCrea had been counseled on the issues multiple times before. Although McCrea contested some of the dates that were listed in the various memos she received about lateness (either in the morning or when returning from lunch), there were several dates when she simply offered justification or excuses for why she was tardy. Additionally, she admitted that she used her personal cell phone at work to deal both with being the executor of her mother's estate and her divorce. Several of the issues Green raised with the city manager when he requested permission to fire McCrea in January 2013—several months before she filed her first civil rights complaint—were also issues in job performance that Green had warned Johnson to be prepared to deal with when she joined the department (and began relying on McCrea as a secretary) in 2007. Additionally, we find credible Johnson's testimony that McCrea's performance fell off in 2012 to a larger-than-documented degree. According to both women, Johnson and McCrea were good friends at the time, and Johnson testified,

> I felt sorry for her. She was going through a lot of turmoil in her life with her divorce and her mother passing away, her children. It just seemed like it was a lot of—a lot of stuff for somebody to tie on, and I felt compassion for her.

While McCrea was suspended one day without pay in December 2013, that was done as a result of her being late for work a few days after being given a written warning involving future tardiness. At trial, McCrea offered an excuse or

justification for her tardiness—winter weather and a resulting car accident that delayed her—but she did not dispute that she was in fact tardy on the day in question.  Much of McCrea's complaints about how she was being treated at the office—things she invariably described as "retaliation"—involved the enforcement of rules, though she maintains they were only enforced against her.  "The anti-retaliation provisions of Title VII and the ICRA do not . . . insulate an employee from discipline for insubordination or ongoing violation of the employer's policies just because they occur after the plaintiff engages in protected activity."  *Wilson v. City of Des Moines*, 338 F. Supp. 2d 1008, 1027 (S.D. Iowa 2004).  Additionally, we note that McCrea's boss, Green, originally approached the city manager requesting to fire McCrea in January 2013—before she filed any complaints—for many of the same reasons for which she was ultimately fired in June 2014.  *See Smith v. Ashland, Inc.*, 250 F.3d 1167, 1174 (8th Cir. 2001) (finding the employee had failed to establish a causal connection where the performance problems were noted by the employer prior to the protected activity).  Many of Green's behaviors and actions that McCrea described as retaliatory or escalating at trial actually, according to the first complaint she filed with the ICRC, began in 2008.  McCrea reported to the commission:

> In about 2008 I started to notice that my boss, Bob Green, was having problems with my performance, taking time off work and watching me when I came and went from work.  Among many complaints he voiced about, Mr. Green started accusing me of being late for work when in fact I was not late.  Then he stopped communicating with me and started a very hostile work environment.  In 2010, I received two write ups for issues that were patently false.  These write ups were issued by Mr. Green.  I contested the write ups because they were false.

As the district court stated in its written ruling, "Poor treatment by an unreasonable boss which is merely harsh, unjust, or rude is not, by itself, legally actionable. An employee must establish a legal cause of action in order to successfully recover damages." Here, because McCrea has not been able to establish a causal connection between the protected activity and the adverse employment action, we end the analysis of the prima facie case and this claim for retaliation fails.

### B. Retaliation for Use of FMLA.

Similar to her claim above, McCrea also maintains she suffered an adverse employment action—termination—because she exercised her rights under FMLA.

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" for various named reasons, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2316(a)(1), (a)(1)(D). Employers are prohibited from retaliating against an employee for exercising the rights given under the FMLA. 29 U.S.C. § 2615(a)(2); *see also Cooper v. Olin Corp., Winchester Div.*, 246 F.3d 1083, 1090 (8th Cir. 2001).

Here, McCrea has the same burden to establish a prima facie case: "To establish a prima facie case of FMLA retaliation, an employee must show that she engaged in activity protected under the Act, that she suffered an adverse employment action by the employer, and that a causal connection existed between the employee's action and the adverse employment action." *See Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002).

McCrea had applied for, was approved to take, and had been on intermittent FMLA leave at the time her employment was terminated in June 2014.[9]  She has satisfied the burden of the first two prongs.  The fighting issue is whether there is a causal connection between the two.   However, the only argument McCrea has in support of her claim of retaliation is the timing of the events.  We are not convinced by this argument alone.  Rather, these facts are comparable to those in *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012).  In *Sisk*, the employee's only evidence of a link between the two elements was "the temporal proximity."  669 F.3d 896, 900 (8th Cir. 2012).  The Eighth Circuit determined that the two months between when the employee was placed on FMLA leave and her termination from employment was not sufficient to establish the prima facie case.  *Id.*  Likewise, here, McCrea's request for FMLA leave was approved by April 3, 2014, and she was not fired until June 6, 2014— approximately two months later.  In *Sisk*, the employee maintained the court should consider when she returned to work—only three days before termination—rather than when she was first placed on FMLA leave, but the court relied on previous precedent, stating, "[T]his court looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended."  *Id.* (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002).

---

[9] McCrea complains the district court misunderstood her claim, finding no causal connection between her 2012 FMLA leave and her June 2014 firing.  We reach the same conclusion using the 2014 FMLA leave.

With nothing else to connect the use of FMLA leave and the termination, McCrea's claim fails. *See id.* ("More than two months is too long to support a finding of causation without something more.").

**C. Reasonable Accommodation under ICRA.**

McCrea maintains the City failed to provide a reasonable accommodation for her disability, as required by the ICRA. Specifically, she asserts the City's refusal to allow her to transfer to a vacant position, which she requested due to her anxiety that was heighted by the issues in the workplace, was discriminatory in nature. She maintains the transfer would have been a reasonable accommodation that would allow her to continue employment with the City.

Because the ICRA "only pronounces a general prescription against discrimination," "we have looked to the corresponding federal statutes to help establish the framework to analyze claims and otherwise apply our statute." *Casey's General Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003); *see also* Iowa Code § 216.6(1). In order to establish a claim based on disability discrimination under the ICRA, McCrea must make a prima facie case by showing by a preponderance of the evidence that "(1) she has a disability, (2) she was qualified for the position sought, and (3) the employment decision was based on her disability." *See Schlitzer v. Univ. of Iowa Hosp. & Clinics*, 641 N.W.2d 525, 530 (Iowa 2002).

The ICRA defines "disability" as "the physical or mental condition of a person which constitutes a substantial disability." Iowa Code § 216.2(5). Similarly, the Americans with Disabilities Act (ADA) defines "disability" as "a physical or mental impairment that substantially limits one or more major life

activities of such individual". 42 U.S.C. § 12102(2); s*ee Bearshielf v. John Morrell & Co.*, 570 N.W.2d 915, 918 (Iowa 1997) (noting that the definitions of "disability" under the ICRA and ADA are similar). The term "major life activities" is further defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." Iowa Admin. Code. r. 161-8.26(3).

In order to show that she was qualified for the new position, McCrea must establish she "could perform the essential functions of [her] job with or without accommodation." *Schlitzer*, 641 N.W.2d at 530 (alteration in original) (quoting *Boelman v. Manson State Bank*, 522 N.W.2d 73, 76 (Iowa 1994)). "If an employee's ability to do her job depends on reasonable accommodation, the employee must make a facial showing that reasonable accommodation was possible." *Id.* If she is able to do so, "the burden shifts to the employer to show that the suggested accommodation was unreasonable or would constitute an undue hardship." *Id.* While an employee can seek accommodation through reassignment to another job with the employer, "[a]n employer is not required to create a vacancy or otherwise create a job for a claimant." *Id.* "The relevant time for determining if a vacancy exists is said to be the time of discharge or other adverse employment decision." *Id.*

Here, the district court found that McCrea's anxiety, while an impairment, did not rise to the necessary level of severity or interference with life activities to constitute a disability. In other words, the court found that McCrea could not prove the first prong of the prima facie case and ended its analysis there. We agree. We acknowledge that we are to "broadly construe" the ICRA "to

effectuate its purposes." *See Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 9–10 (Iowa 2014) (discussing the 2008 Congressional amendments to the ADA that were made in rejection of "several opinions of the Supreme Court that have had the effect of restricting the meaning and application of the definition of disability"). However, we are persuaded by similar cases where the plaintiff's anxiety did not rise to the level of being a disability.

In *McGuinness v. University of New Mexico School of Medicine,* 170 F.3d 974, 978 (10th Cir. 1998), the Tenth Circuit considered whether a student's "anxiety disorder" fell within the definition of disability under the ADA. The parties agreed that the student's anxiety "manifests itself when he takes chemistry and mathematics tests," and the district court determined that "such a disorder, limited to certain academic subjects, does not constitute a disability under the ADA. *McGuinness*, 170 F.3d at 977. In considering the district court's decision, the Tenth Circuit "assess[ed] three factors to determine whether an individual is 'substantially limited' in a major life activity: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanence or expected long-term impact of the impairment." *Id.* at 978; *but see Goodpaster*, 849 N.W.2d at 11 (citing approvingly a law review article that states some disabilities are "neither permanent nor evanescent," and then stating it "has for years contemplated some disabilities might be permanent"). The court affirmed the ruling of the district court, analogizing the student's claim to that of "an airline mechanic whose impaired vision prevented him from taxiing aircraft was not disabled under the ADA because he was only disqualified from 'a single, particular job.'" *McGuinness*, 170 F.3d at 978 (citing *MacDonald v. Delta Air*

*Lines, Inc.*, 94 F.3d 1437, 1145 (10th Cir. 1996)). As the court pointed out, "an individual does not suffer a disability under the ADA if [their] disability does not prevent [them] from performing 'a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Id.* (citation omitted).

Similarly, in *Torres v. Weigel Broadcasting Co.*, 852 F. Supp. 2d 1106, 1108 (E.D. Wis. 2012), the employee informed her employer that she had "anxiety and depression issues, and that, 'workwise' she would get nervous easily." Around the same time, the employee was hospitalized for one day for reasons relating to her anxiety. *Torres*, 852 F. Supp. 2d at 1108. The employee also had three or four instances where she left her post during work because she became nervous and had to go to the bathroom to calm herself down. *Id.* The employee was ultimately terminated from the employment, and she filed a discrimination suit. *Id.* at 1110. The court found that the employee had not established that she had a disability, noting "plaintiff's anxiety seems to have impeded her ability to work as a production crew member in live television. But *impeding* one's ability to perform a *specific* job is not the same thing as *substantially limiting* one's *general ability* to work." *Id.* at 1111. Additionally, the court found that even though the employee's anxiety caused her to leave her station four times and was once hospitalized for it—all affecting her ability to work—this did not constitute a "substantial limitation" on a major life activity. *Id.*; *see also Ogborn v. United Food & Com. Worker's Union*, 305 F.2d 763, 767 (7th Cir. 2002) (holding that a mental impairment that causes inability to work for short period of time does not substantially limit a person's ability to work); *Cassimy v.*

*Bd. of Educ. of Rockford Pub. Sch.*, 461 F.2d 932, 936 (7th Cit. 2006) (holding that mental impairment that merely impeded ability to work does not substantially limit major life activity of working).

Here, McCrea has not named any major life activities—other than her specific workplace—that were affected by her anxiety. Even her claims involving her employment do not rise to the level of substantially limiting her ability to perform her job. At the time McCrea requested to be transferred to a similar position within the City—in January 2013—her doctor stated she had "no limitations in performing the essential functions outlined in the job description [that was] provided." The letter from the doctor included a statement that McCrea's then-current position was a "negative work environment" that was impacting her anxiety levels, but even that statement goes to McCrea's ability to work that one job, not her ability to work in general. As stated above, "an individual does not suffer a disability under the ADA if [their] disability does not prevent [them] from performing 'a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *McGuinness*, 170 F.3d at 978 (citation omitted).

Because McCrea has not established that her impairment was so severe as to constitute a disability, she is unable to establish a prima facie case to support her claim that the City's refusal to allow her to transfer positions was discriminatory. We agree with the district court that this claim fails.

**IV. Conclusion.**

McCrea has failed to establish a prima facie case for retaliation under either the Iowa Civil Rights Act or the Family Medical Leave Act. She also has

failed to establish that her anxiety rises to the level of a disability under the Iowa Civil Rights Act, so her claim for failure to accommodate also fails. We affirm the district court's ruling.

**AFFIRMED.**