# IN THE COURT OF APPEALS OF IOWA

No. 16-0208
Filed May 17, 2017

**JOHN VETTER,**
        Plaintiff-Appellee/Cross-Appellant,

**vs.**

**STATE OF IOWA, IOWA DEPARTMENT OF NATURAL RESOURCES, AARON LUMLEY and PAUL TAUKE,**
        Defendants-Appellants/Cross-Appellees.
_____

        Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

        Both parties appeal following a verdict in favor of the plaintiff on his employment-discrimination claims. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

        Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, David S. Steward and Julia S. Kim, Assistant Attorneys General, for appellants/cross-appellees.

        Brooke Timmer and Whitney Judkins of Fiedler & Timmer, P.L.L.C., Johnston, for appellee/cross appeallant.

        Heard by Doyle, P.J., and Tabor and McDonald, JJ.

**DOYLE, Judge.**

The State of Iowa appeals the judgment entered in favor of John Vetter on his claims of employment discrimination based on his disability. The State challenges the sufficiency of the evidence supporting the jury's verdict, several jury instructions, and the amount of damages awarded. Vetter cross-appeals, arguing the trial court erred in refusing to award his litigation expenses.

**I. Background Facts and Proceedings.**

John Vetter began working for the Iowa Department of Natural Resources (DNR) in 1976 as a natural resources technician at the state forest nursery in Ames. He injured his back at work in July 2011, which ultimately led to spinal surgery in November 2011. When Vetter returned to work in January 2012, he was initially assigned light-duty work before gradually resuming his normal job duties. Although Vetter occasionally sought help from his coworkers in lifting heavy objects, he was able to perform his essential job duties.

In September of 2012, Vetter underwent a functional capacity evaluation to determine his physical limitations following his work injury. The evaluation revealed limitations to the amount of weight Vetter could lift and carry and the amount of time he could sit, stand, walk, climb, or bend each day. The evaluation resulted in the issuance of permanent restrictions on Vetter's ability to engage in these activities. Vetter was also restricted from all squatting activity.

In January 2013, the State's workers' compensation administrator sent the DNR the list of permanent restrictions identified during the functional capacity evaluation and inquired as to whether the DNR could accommodate them. HR was called. Legal was consulted. Consultants were hired. In order to determine

whether accommodations were possible, the DNR obtained two workplace assessments that each recommended accommodations for Vetter based largely on information provided by Vetter's supervisor. The suggested accommodations included job rotation every two-and-one-half hours and purchasing a customized tractor. However, the evaluators never talked to Vetter about his job duties or any accommodations he needed.

The DNR also failed to discuss the suggested accommodations with Vetter or to otherwise ask him what, if any, accommodations he felt he needed to perform his job. Instead, the DNR determined that implementing the suggested accommodations "would have a detrimental impact on the business needs of the DNR and that such accommodations would result in an undue burden on the DNR and the State of Iowa" and terminated Vetter's employment. Because the evaluators based their suggested accommodations on erroneous information about Vetter's job duties, Vetter does not believe they were necessary.

Vetter filed a petition alleging the State violated the provisions of the Iowa Civil Rights Act (ICRA) by discriminating against him with respect to the terms and conditions of his employment based on his disability or a perceived disability, and by failing to reasonably accommodate his disability. At the close of trial, the following verdict form was provided to the jury:

> **Question 1:** Did Plaintiff prove his claim of Disability Discrimination against Defendants? (*Please mark an "X" in the appropriate spaces.*)
>
> YES _____   NO _____
>
> (Proceed to Question 2.)

**Question 2:** Did Plaintiff John Vetter prove his claim that Defendants failed to provide him with a reasonable accommodation? (*Please mark an "X" in the appropriate spaces.*)

YES _____     NO _____

(Proceed to Question 3.)

**Question 3:** Did Plaintiff John Vetter prove his claim of Perceived Disability Discrimination against Defendants? (*Please mark an "X" in the appropriate spaces.*)

YES _____     NO _____

(Proceed to Question 4.)

(If your answer to Questions 1, 2, or 3 is "yes," proceed to Question 4. If your answers to each of Questions 1, 2, and 3 is "no," then do not answer any more questions.)

The jury answered "yes" to questions 1 and 2, but it left question 3 unanswered.[1]

The jury then proceeded to question 4 to determine the amount of Vetter's damages, which it determined to be $164,732.13 in back pay, $250,000.00 for past emotional distress, and $185,000.00 for future emotional distress, for a total damage award of $599,732.13. The trial court awarded Vetter an additional $88,690.19 in front pay damages, for a total award of $688,422.32.

The trial court denied the State's motion for judgment notwithstanding the verdict, finding Vetter proved he was disabled, that his disability was a motivating factor in the DNR's decision to terminate his employment, and that the DNR denied Vetter's request for accommodation. The court denied the State's motion

---

[1] During her closing argument, with regard to Question 3—the perceived-disability claim, Vetter's trial counsel told the jury that:

> If you have marked 'yes' to either Questions 1 or 2 on the verdict form, you don't get to this claim because you've already found [Vetter] had a disability. You only get to this claim if you don't think John had a disability. Like I said, we don't think you'll get to this claim.

for new trial after finding substantial evidence supported the jury's award of damages for emotional distress. The trial court awarded Vetter $245,281.50 in attorney fees and $837.14 in expenses. The State appealed, and Vetter cross-appealed.

## II. Sufficiency of the Evidence.

The State first contends the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict because the evidence was insufficient to show it discriminated against Vetter based on his disability.

### A. Scope of review.

We review sufficiency-of-the-evidence claims for the correction of errors at law. *See Faber v. Herman*, 731 N.W.2d 1, 6 (2007) (setting forth the standard of review for rulings on motions for judgment notwithstanding the verdict); *Figley v. W.S. Indus.*, 801 N.W.2d 602, 609 (Iowa Ct. App. 2011) (addressing the standard of review for rulings on motions for directed verdict). The question we must ask is whether substantial evidence supports each element of the plaintiff's claims. *See Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 391 (Iowa 2001) (jnov); *Figley*, 801 N.W.2d at 609 (directed verdict). Evidence is substantial if a reasonable mind would accept it as adequate to reach a conclusion. *See Figley*, 801 N.W.2d at 609-10. In making this determination, we view the evidence in the light most favorable to the nonmoving party. *See Gibson*, 621 N.W.2d at 391; *Figley*, 801 N.W.2d at 610.

### B. Elements of a disability-discrimination claim.

The ICRA protects employees from being discharged or otherwise discriminated against in their employment based on their disability. *See* Iowa

Code § 216.1 (2013). Like its federal counterpart,[2] the ICRA protects against two types of discrimination: discrimination involving disparate treatment and discrimination based on a disparate impact. *See Pippen v. State*, 854 N.W.2d 1, 9 (Iowa 2014).

> "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, . . . national origin[, or disability]. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. . . .
> Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive . . . is not required under a disparate-impact theory.

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

Vetter claims the DNR engaged in disparate treatment discrimination based on his disability. In order to succeed on his claims, Vetter was required to show he is a person with a disability, he was qualified to perform his job either with or without an accommodation for his disability, and he suffered an adverse employment decision because of his disability. *See Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003).

---

[2] Because the ICRA and the Americans with Disabilities Act (ADA) have common purposes of prohibiting disability discrimination and share similar terminology, the Iowa Supreme Court has "look[ed] to the ADA and underlying federal regulations in developing standards under the ICRA for disability discrimination claims*." Bearshield v. John Morrell & Co.*, 570 N.W.2d 915, 919 (Iowa 1997).

**1. Whether Vetter has a disability.**

The court instructed the jury that, in order to prove his disability-discrimination claims, Vetter was required to show by a preponderance of the evidence that he had a back impairment and that his back impairment was a "disability" because "it substantially limited him in one or more major life activities." *See* Iowa Admin. Code r. 161-8.26(1) (defining "disability"); *see also Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 n.1 (Iowa 2014) (interpreting rule 161-8.26 to "provide the relevant definition of those persons covered by the ICRA"). The jury instructions define "impairment" to mean "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine." With regard to whether a disability impairs a major life activity, the court instructed the jury:

> "Major life activities" are functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. A person is "substantially limited" in a "major life activity" if the person is unable to perform a major life activiiy that the average person in the general population can perform, or is significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform the same major life activity. The phrase "substantially limits" should be interpreted broadly. The determination of whether a condition substantially limits a major life activity must be made without considering the helpful effects of mitigating measures such as medications, surgery, physical therapy, or other treatment or devices that improve the condition.
>
> To determine whether [Vetter] is substantially limited in a major life activity, you should consider (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; (3) the permanent or long term impact, or the expected

permanent or long-term impact of or resulting from the impairment; and (4) whether the individual is impaired during episodes or flare-ups, even if life activities are not impaired at all when in remission.

*See* Iowa Admin. Code r. 161-8.26(3); *Bearshield*, 570 N.W.2d at 919 (citing 29 C.F.R. § 1630.2(j) (1997)[3]).

The undisputed evidence shows Vetter suffered a back injury that required medical treatment, including surgery. The evidence also supports a finding that the injury affected his musculoskeletal system. Vetter's back injury impaired his ability to lift, carry, sit, stand, walk, climb, bend, and squat, as is reflected in the work restrictions issued by the doctor who examined Vetter during his functional capacity evaluation. Vetter also testified that compared to the average person, he was limited in his ability to lift, sit, walk, bend, or climb:

> Q. Was your back condition a physical impairment? A. Yes, it was.
> Q. In 2012 and 2013 were you able to lift as much as the average person with your back condition? A. No, I was not.
> Q. Did your back condition limit your ability to lift? A. It did, yes.
> Q. Does your back condition still limit your ability to lift as much as the average person? A. Yes, it does.
> Q. In 2012 and 2013 did your back condition limit your ability to sit, stand, walk, bend, kneel, or climb as much as the average person? A. Yes, it did.

Lewis Vierling, a vocational rehabilitation counselor and consultant who has "been heavily involved in doing research with the Americans with Disabilities Act" since 1996 or 1997, testified as an expert witness for Vetter. In assessing whether Vetter has a disability, Vierling "[l]ooked at the limitations that were assigned to him, his skills and abilities, the type of skills that he had acquired

---

[3] We note that Congress has since amended the ADA to protect a broader range of people. *See Goodpaster*, 849 N.W.2d at 8-9 (discussing the expansion of coverage under the Americans with Disabilities Act Amendments Act of 2008).

through his work," reviewed his job description and the job descriptions developed by the Department of Labor to determine a vocational profile. Vierling testified that the work restrictions placed on Vetter's back injury show he is restricted in his ability to participate in the major life activities of sitting, standing, walking, and lifting compared to the average member of the workforce.

> Q. What is it that you learned John could not do with regard to his disability? A. The main [thing he] could not do, the main restriction, was lifting, weight-wise from—he was in the 20- to 25-pound range and also walking, standing, sitting, there [were] some limitations there, although they did not appear to be very restrictive to me. Those were the main ones.
> And the lifting is kind of a main one because jobs usually start out with indicating that there's an amount that you should be able to lift in that job and then the frequency of the lifting. And I believe in his job it was up to 50 pounds on an occasional basis, which is about a third of a person's workday.
> So looking at that and then looking at his restrictions and then talking to him about the work and about how he had been doing the work after returning for about a year, actually more than a year, it was very interesting.
> Q. Was it your understanding that John was limited in lifting between 20 or 25 up to 50 pounds? A. 20 to 25 pounds.
> Q. Right, depending on whether it was waist to floor or— A. Yes.
> Q. —waist to crown, I think? A. Yes.
> Q. 20 or 25— A. To waist and then overhead as well, yeah.
> Q. Did you learn what kind of things John was able to do if he was ever required to lift in that range, that he had options available to him in the workplace? A. That he could do?
> Q. Right. Like, in order to not have to lift between 25 and 50? A. Yes. He had some equipment that he had used in the past.

Ultimately, Vierling determined that Vetter has a disability under Iowa law.

Vetter also presented testimony from Vienna Hoang, an assistant technology counselor specialist at Vocational Rehabilitation Services for the State of Iowa who was asked by the DNR to write a report recommending accommodations for Vetter's disability. Hoang testified:

Q. And it was your understanding that the State believed John had a disability when they asked you to write the report; right? A. Correct, yes.

Q. That was the whole reason you were brought in; correct? A. Yes.

. . . .

Q. . . . You had no reason to disagree that John Vetter had a disability since you saw his restrictions; correct? A. Correct.

Q. Having seen his restrictions, you believe that he was more limited than the average person in his ability to do things like lift, bend, kneel, sit, stand, walk, or climb; right? A. Yes.

The State argues Vetter does not have a physical impairment that impairs a major life activity, citing testimony from Vetter's coworkers that he was able to perform his job duties and Vetter's own belief at that time his discharge that he was not disabled. However, the perception of others is not relevant to the question of whether a person has a disability.[4]

A reasonable jury could have found the State's evidence regarding Vetter's lack of a disability was not credible and rejected it. *See Kaiser v. Stathas*, 263 N.W.2d 522, 526 (Iowa 1978) (noting a jury need not accept testimony that is "contrary to natural laws, inherently improbable or unreasonable, opposed to common knowledge, inconsistent with other circumstances established in evidence, or . . . contradictory within itself"). For instance, Paul Tauke, bureau chief of forestry for the DNR, testified that the average person is able to meet the physical demands of the natural resource technician job. He also agreed that Vetter's restrictions limited him in his ability

---

[4] An employer can be liable for discriminating against an employee who does not have a disability if the employer treats the employee differently than others because it perceives the employee to have a disability. *See Vincent v. Four M Paper Corp.*, 589 N.W.2d 55, 62 (Iowa 1999). Vetter pled discrimination based on perceived disability as an alternative to his claims of discrimination based on his disability. However, the jury did not render a verdict on this claim.

to perform the duties of a natural resource technician without accommodation. In spite of that, Tauke did not believe Vetter was disabled. Aaron Lumley, who supervised the state nursery, likewise testified that Vetter was impaired in his ability to lift, kneel, sit, stand, walk, climb, bend, or squat in comparison to the average person. He also agreed those activities could qualify as major life activities. However, Lumley continued to dispute that Vetter was disabled:

> Q. So still using my definition of "disability," is it still your position that John is not disabled? A. At this time I was really going on those work restrictions. I did not consider him disabled at that time.
> Q. And you still don't? A. Correct.

Like Tauke, Lumley argued that it was Vetter's work restrictions—not the underlying back condition that resulted in those restrictions—that prevented Vetter from doing his job. However, Lumley eventually admitted that if Vetter did not receive accommodations for his permanent restrictions, he would be restricted from the major life activity of working:

> Q. So given the definition you and I talked about before that John Vetter, with those restrictions, is limited as compared to the average workforce, he's disabled, didn't we agree on that? A. . . . I said the work restrictions placed upon him made those things harder to do without accommodations, I believe.
> Q. Well, let's go back to the definition in Exhibit 1, the employee handbook . . . . You knew John had a physical impairment, he had . . . the back condition? A. I knew that John had permanent work restrictions.
> Q. [H]is back was physically affecting his ability to do his job? A. His back was injured, yes.
> Q. And major life activities, they give some list there, but it's more comprehensive than that list. Do you know that? A. I would assume so, yes.
> . . . .
> Q. So we know he's actually affected in his ability to walk as compared to the average person? A. That's what the doctor said.
> Q. And we also have agreed that the State said, "We have to fire you, we're taking your job away, your ability to work, because

we don't think you can physically do the job anymore"; yes? A. He could physically do the job. He just had doctor's restrictions. So there are portions—he could walk, right, he could bend, he could kneel at times, I believe.

Q. If he could physically do the job, why was he fired? A. Because not all the time he could because his doctor's note said, "Here's what he can work within, and I did not want any time for that to be violated."

Q. So he was limited in the major life activity of working because you didn't believe you could accommodate that he could work with those restrictions? A. I follow you. I'll agree.

Substantial evidence supports the jury's finding that Vetter has a disability. Vetter's back condition is an injury to his musculoskeletal system that is permanent in nature and limits his ability to perform major life activities as compared to the average person. He is restricted in the manner and duration in which he may engage in these activities, and he is restricted from squatting altogether. That he could perform the essential functions of his job at the DNR with some accommodation speaks to whether he was qualified for his position, not whether he was substantially impaired.

**2. Whether Vetter was qualified for the position.**

The State does not challenge the second element Vetter's disability-discrimination claims, which requires a finding that Vetter was a qualified employee. Even if it had, substantial evidence supports the finding Vetter was able to perform—and had performed—the essential functions of his job with an accommodation for his lifting restrictions.

**3. Whether Vetter suffered an adverse employment decision because of his disability.**

Finally, to succeed on his disability discrimination claims, Vetter was required to show he suffered an adverse employment decision because of his disability.

In most cases in which employment discrimination occurs, the discriminatory motive for the adverse employment decision "will rarely be announced or readily apparent." *Hamer v. Iowa Civil Rights Comm'n*, 472 N.W.2d 259, 263 (Iowa 1991). In those cases where there is no direct evidence that the adverse employment decision was based on disability, "evidence concerning the employer's state of mind is relevant in determining what motivated the acts in question." *Id.*; *see also Casey's Gen. Stores*, 661 N.W.2d at 520 n.3 (noting this analysis was formulated "because direct evidence of discrimination is frequently unavailable, and an employee must rely on circumstantial evidence to establish discriminatory intent"). The employee bears this "initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the [law].'" *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576 (1978) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)). If the employee establishes this inference, "the burden shifts to the employer to show a legitimate nondiscriminatory reason for the adverse employment decision." *Casey's Gen. Stores*, 661 N.W.2d at 519-20. "Once an employer proffers a legitimate nondiscriminatory reason, the

burden shifts back to the claimant to show the reason proffered by the employer is pretextual." *Id.* at 520.

However, in a smaller number of cases, there is direct evidence that the employer based its adverse employment decision on an employee's disability. *See Boelman v. Manson State Bank*, 522 N.W.2d 73, 79 (Iowa 1994) (articulating the test for cases in which an employer "relies on disability-related reasons" for discharging an employee); *see also Vaughan v. Must, Inc.*, 542 N.W.2d 533, 538 (Iowa 1996) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)). In those cases, the focus is typically on whether the employee is disabled or qualified for the position rather than whether the employee suffered an adverse employment decision based on a disability. *See Boelman*, 522 N.W.2d at 79. Cases involving direct evidence do not employ the *McDonnell Douglas* burden-shifting test. *See id.* When the employer bases an adverse employment decision on an employee's disability, there is pretext for the discriminatory decision.[5] *See id.*

Vetter alleged two different adverse actions to support his employment-discrimination claims. Vetter claimed the DNR terminated him because of his disability. He also alleged the DNR failed to accommodate his disability. *See Casey's Gen. Stores,* 661 N.W.2d at 521 (holding an employer's failure to make

---

[5] Once an employee has proved the elements of a disability-discrimination claim, the employer may rely on an affirmative defense like undue hardship to insulate it from liability. *Cf. Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002) (noting that once the plaintiff has established the elements of a discrimination case, the defendant may present evidence of an affirmative defense (specifically citing the affirmative defense of undue hardship)); *Willis v. Conopco, Inc.*, 108 F.3d 282, 286 (11th Cir. 1997) (distinguishing an employee's burden of establishing a reasonable accommodation exists as part of its burden of proof with the employer's burden of pleading and proving the affirmative defense of undue hardship).

a reasonable accommodation for an otherwise qualified person with a disability is an adverse employment action supporting a separate claim for recovery); *see also Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002) (stating an employer commits unlawful discrimination if the employer does not make a reasonable accommodation for a known physical or mental limitation of an otherwise qualified individual with a disability). We consider each claim in turn.

### a. The termination of Vetter's employment.

The DNR provided only one reason for terminating Vetter. In the letter terminating his employment, the DNR disclosed that it was discharging Vetter because the cost of accommodating his restrictions would be unduly burdensome. Those permanent restrictions were issued because of Vetter's disability. Therefore, the adverse employment decision was based on Vetter's disability. *See Boelman*, 522 N.W.2d at 78 (noting the only reason the defendants offered for terminating the plaintiff was disability-related where the plaintiff was terminated for performance and the plaintiff's disability caused the poor performance). Substantial evidence supports the jury's finding the DNR discriminated against Vetter when it terminated him based on his disability.

### b. Reasonable accommodation.

The State challenges the finding that failed to reasonably accommodate his disability.[6] It argues Vetter failed to request an accommodation for his

---

[6] The verdict form did not ask the jury to submit a separate damage calculation on each individual theory of disability discrimination it found Vetter had proved. We surmise that both the claim regarding termination and the failure-to-accommodate claim resulted in the same damages. Vetter may not recover damages on each theory of liability because his damages flow from a single action and recovering damages under both would be duplicative. *See Lara v. Thomas*, 512 N.W.2d 777, 783 (Iowa 1994). Accordingly, our

disability, claiming the permanent restrictions placed on Vetter do not equate to a request for accommodation.

In interpreting comparable federal law concerning failure-to-accommodate claims, the Eight Circuit observed that in order to trigger the duty to make a reasonable accommodation, the employer must be aware that the employee has a disability and is seeking accommodation for that disability. *See Ballard*, 284 F.3d at 962 (citing *Taylor v. Phoenixville Sch. Dist.*, 174 F.2d 142, 158-59 (3d Cir. 1999)); *Walsted v. Woodbury Cty.*, 113 F. Supp. 1318, 1335 (N.D. Iowa 2000). Although, generally, an employee must inform an employer of a disability and the need for an accommodation, an express request for an accommodation is unnecessary when the disability and need for accommodation are obvious. *See Walsted*, 113 F. Supp. at 1335.

Here, Vetter's disability developed as a result of a work-related injury, of which the DNR was aware. When Vetter returned to work in January 2012, the DNR accommodated his disability. One year later, the workers' compensation administrator provided the DNR with a list of permanent restrictions recommended as a result Vetter's functional capacity evaluation. The DNR then hired two consultants to determine whether it could accommodate the recommended restrictions. These facts sufficiently triggered the DNR's duty to make reasonable accommodations. Vetter was not required to inform the DNR of a disability it already had knowledge of or to request accommodations that the

finding that sufficient evidence supports the jury's verdict on Vetter's claim regarding his termination alone provides a basis for a damage award. Regardless, we will address the sufficiency of the evidence supporting Vetter's theory of liability based on the DNR's failure to accommodate.

State had been providing. In spite of its knowledge of Vetter's disability, the DNR failed to include Vetter in the process of determining which accommodations would be necessary to allow him to perform his job duties. *See Magnussen v. Casey's Mktg. Co.*, 787 F. Supp. 2d 929, 956 (N.D. Iowa 2011) (noting the determination of whether an accommodation is possible "requires an interactive process"); *see also Casey's Gen. Stores,* 661 N.W.2d at 521 (holding that the ICRA requires "an interactive process that engages the employee and employer to work in concert to achieve a reasonable accommodation"). Instead, it determined that the cost of accommodating Vetter's disability was unduly burdensome and terminated him. Sufficient evidence supports Vetter's claim of disability discrimination based on the failure to accommodate his disability.

### III. Jury Instructions.

The State also challenges several of the trial court's rulings relating to the jury instructions, arguing the trial court erred in failing to give one of the State's requested instructions. It also challenges three of Vetter's proposed instructions that the court gave the jury.

### A. Scope of review.

We review challenges to jury instructions for correction of errors at law. *See Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016). If a requested instruction correctly states the applicable law and is not embodied in the other instructions, the trial court is required to give it. *See id.* Likewise, giving an instruction that materially misstates the law ordinarily requires reversal. *See Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 902 (Iowa 2015). However, reversal is only warranted if the error is prejudicial. *See Herbst v. State*, 616

N.W.2d 582, 585 (Iowa 2000) (citation omitted). The burden is on the party claiming harmlessness, and we assume prejudice has occurred unless the record firmly establishes the contrary. *See Rivera*, 865 N.W.2d at 903.

In determining whether error was harmless, we "first guess" the jury by trying to divine what the jury would have done if it had been properly instructed. *See id.* Harmless error occurs "if the record affirmatively establishes that a party has not been injuriously affected by the alleged error or that there has not been a miscarriage of justice." *Id.* If a party succeeds on two theories, any error in instructing on one theory is harmless if the jury was properly instructed on the other theory. *See id.* Finally, failure to give a requested instruction is harmless if the idea is contained in the instructions as a whole. *See id.*

**B. Business judgment instruction.**

The State first argues the trial court erred in refusing to give its requested instruction on business judgment. That instruction states:

> An employer is free to terminate an employee's employment for any nondiscriminatory reason even if its business judgment seems objectively unwise. Therefore, you may not return a verdict for Plaintiff just because you might disagree with [the DNR's] actions or believe them to be harsh or unreasonable.
> You may, however, consider the believability of an explanation in determining whether it is a cover-up or pretext for discrimination. In order to succeed on his . . . disability-discrimination claims, [Vetter] must persuade you, by a preponderance of the evidence, that were it not for . . . disability discrimination, his employment would not have been terminated.

In support of giving this instruction, the State notes the Iowa Supreme Court has held: "An employer is entitled to make his own policy and business judgments, and may, for example, fire an adequate employee if his reason is to hire one who will be even better, as long as this is not a pretext for discrimination." *Woodbury*

*Cty. v. Iowa Civil Rights Comm'n*, 335 N.W.2d 161, 166 (Iowa 1983) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979)).

Assuming the business judgment instruction is a correct statement of the law, the trial court's failure to give the instruction was harmless. The *Woodbury County* case, like the other cases cited by the State,[7] is a case involving indirect evidence of discrimination, analyzed under the *McDonnell Douglas* burden-shifting test. *See id.* As we have already stated, the only reason the DNR provided for Vetter's termination related to his disability. Because this reason is direct evidence of discriminatory animus, there is no need to use the *McDonnell Douglas* burden-shifting test. *See Vaughan*, 542 N.W.2d at 539; *Boelman*, 522 N.W.2d at 79. The State was not prejudiced by the court's failure to give the requested instruction. *See Ladeburg v. Ray*, 508 N.W.2d 694, 696 (Iowa 1993) (holding no prejudice resulted from error in comparative fault instructions when the jury did not find plaintiff at fault).

## C. Unconscious bias instruction.

The State complains the trial court erred in giving the jury Vetter's requested instruction on unconscious bias. That instruction states:

> The law recognizes that unlawful discrimination sometimes happens without the decisionmaker having planned, thought out, or

---

[7] In addition to *Woodbury County*, the State cites *Farmland Foods, Inc. v. Dubuque Human Rights Commission*, 672 N.W.2d 733, 743 (Iowa 2003) (noting Farmland Foods' failure to recall an African American employee was "at the very heart of the employer's business judgment and expertise" because it encompassed Farmland Foods' ability to allocate its resources), *Cerro Gordo County Care Facility v. Iowa Civil Rights Commission*, 401 N.W.2d 192, 197 (Iowa 1987) ("We may examine the employer's motive to determine whether the employer was moved by discriminatory bias rather than business judgment."), and *Nelson v. James H. Knight DDS, P.C.*, 834 N.W.2d 64, 69 (Iowa 2013) (noting an employer does not violate the ICRA by treating an employee unfairly so long as the employer does not engage in discrimination based on an employee's protected status).

even acknowledged to himself or herself that it is taking place. The law acknowledges the effect of society's stereotypes on employers in their decisionmaking, and that biased decisionmaking based upon those stereotypes can violate the law, even if the decisionmaker is unaware of bias in his or her thinking. This is because the law's purpose is to eradicate discrimination in all forms, regardless of the personal character of the individuals making discriminatory decisions.

If you find from all the surrounding circumstances that Defendants treated Plaintiff differently than it would have if he had not had a disability, even if the managers do not acknowledge or realize their own motives, you may find in favor of Plaintiff.

The State argues that the instruction misstates the law because it allowed the jury to find it engaged in disparate treatment of Vetter without the necessary proof of intent.

We need not decide whether the instruction was a proper statement of law because the instruction was inapplicable to the facts of Vetter's case. The instruction concerns an employer's discriminatory animus in making adverse employment decisions when there is only indirect evidence to establish it. Because Vetter's claims involve direct evidence that the DNR terminated Vetter based on his disability or failed to provide him a reasonable accommodation for his disability, the instruction should not have been given. *See Bride v. Heckart*, 556 N.W.2d 449, 452 (Iowa 1996) ("*The submission of instructions upon issues that have no support in the evidence is error.*" (citation omitted)).

Although it was error to give the requested instruction concerning unconscious bias, reversal is not required because the error was harmless. The jury instruction relates to those cases where a discriminatory animus is hidden. Because Vetter proved the adverse employment decisions made in his case were directly related to his disability, the jury had no need to look further into the

DNR's motives.  Because the instruction did not affect any determination made by the jury, the error was harmless.

### D.  Pretext instruction.

The State also challenges the trial court's decision to give Vetter's instruction regarding pretext.  That instruction states:

> The employer's stated explanation for refusing to accommodate Plaintiff or for terminating him must be specifically articulated and non-discriminatory.  The reasonableness of the employer's explanation may be considered in determining whether it is a pretext, or a cover-up for disability discrimination.
>
> Proof that the Defendants' explanation is not true is one form of evidence that you may find proves discrimination.  If you find that Defendants' justification for refusing to provide Plaintiff with an accommodation or for terminating him is not true, discrimination may be the most likely alternative explanation.  This may be especially so, since Defendants are in the best position to put forth the actual reasons for their decision.
>
> You may find that Plaintiff's disability was a motivating factor in the Defendants' refusal to accommodate him or their decision to terminate him if it has been proven that the Defendants' stated reason for their decision is not the real reason, but it is pretext to hide discrimination.
>
> You may find that disability discrimination occurred, if you find that the reasons offered by the Defendants for refusing to provide accommodations or terminating Plaintiff are false.

The State argues this jury instruction misstates Vetter's burden of proof because it allowed the jury to find the DNR engaged in discrimination if it disbelieved the DNR's reason for terminating Vetter without clearly requiring the jury to also believe it intentionally discriminated against him.

Again, Vetter's claims did not require a burden-shifting analysis, and Vetter was not required to show the DNR's offered reason for terminating him or failing to accommodate his disability was pretext for discrimination.  Both his claims involved direct evidence that the adverse employment actions alleged—

termination and failing to accommodate his disability—were based on his disability. Therefore, the instruction on pretext was not warranted.

We again conclude there was no prejudice to the State in instructing the jury on pretext because Vetter's success did not require him to discredit any nondiscriminatory reasons for the DNR's actions. The DNR based its adverse employment decisions on Vetter's disability. Therefore, the pretext instruction had no bearing on the outcome of trial.

**E. Reasonable accommodation instruction.**

Finally, the State argues the court erred in instructing the jury on the law relating to reasonable accommodations. The State complains that the court instructed the jury that Vetter had to prove that either he "requested accommodation for his disability *or* [the DNR] knew or should have known that [Vetter] needed accommodation for his disability." (Emphasis added.) The State also complains about another jury instruction, which states in part:

> When an employer becomes aware that an employee is disabled and may need an accommodation, the law requires the employer to initiate an informal, interactive process to determine appropriate reasonable accommodations. All that is required to trigger an employer's duty to engage in the interactive process is knowledge (including circumstantial) that the employer may have a condition that may qualify as a disability and result in some limitation that could require an accommodation.

The State argues that to succeed on his failure-to-accommodate claim, Vetter had the burden of showing he requested a reasonable accommodation. It claims the jury instructions erroneously lowered Vetter's burden of proving he requested an accommodation.

As stated in our analysis regarding the sufficiency of the evidence to support Vetter's failure-to-accommodate claim, an employee is not required to personally request an accommodation when the employee's disability and need for an accommodation are obvious. *See Walsted*, 113 F. Supp. at 1335. Because the instruction correctly states the law, we affirm.

**IV. Damage Award.**

In its final assignment of error, the State argues the trial court erred in denying its motion for new trial based on its claim the jury awarded excessive damages. Specifically, the State claims the jury's award of $435,000 for emotional distress damages is unsupported by the record and that passion or prejudice influenced the award.

**A. Scope of review.**

We review a motion for new trial based on discretionary grounds for an abuse of discretion. *See Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009). In order to receive a new trial, the State must affirmatively establish its claim that the verdict was motivated by passion or prejudice. *See id.* A verdict that is clearly excessive is presumed to have been a product of passion or prejudice. *See id.* If it is not clearly excessive, passion or prejudice must be found in the record evidence. *See id.*

**B. Award of emotional distress damages.**

An award of damages for emotional distress is available under the ICRA. *See Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 525 (Iowa 1990). Such damages are recoverable under the ICRA even if there is no showing of physical injury, severe distress, or outrageous conduct. *See id.*

The amount of damages to award is primarily a jury question, and we will not interfere if the award is within a reasonable range of the evidence. *See Jasper,* 764 N.W.2d at 772.

Generally, damages for emotional distress are highly subjective and not easily calculated in economic terms. *See id.* In determining whether a damage award for emotional distress is excessive, it is helpful to consider the range of such damages awarded in similar cases. *See id.* However, our supreme court has acknowledged that

> the upper range of emotional-distress damages increases as the nature of the wrongful conduct involved becomes more egregious, and the emotional distress suffered becomes more severe and persistent. Even the length of the employment, compatibility of the worker in the employment, age and employment skills of the worker, and the span of time necessary to become reemployed impact the amount of emotional-distress damages.

*Id.* at 773.

In denying the State's motion for new trial based on an excessive award of damages for emotional distress, the trial court held:

> The court agrees with plaintiff that the jury's damage award for emotional distress, while certainly at the upper end of the range of reasonable awards for such injuries, was nevertheless supported by substantial evidence in the record and was not excessive. As further support for its conclusion that the jury's award was not excessive, the court cites defendants' remarkable and totally unexpected change of position at trial and in the middle of presentation of their case in chief, specifically, from one of complete denial of liability to one of admitting that they made mistakes and essentially saying that, if they had it all to do over again, plaintiff would still be employed by defendants, and then apologizing to plaintiff for same.[8] In the court's view, defendants

---

[8] After sincerely regretting the paper-based decision to fire Vetter, Vetter's immediate supervisor said at trial: "And John, I'm very sorry. I made mistakes. I am very sorry. And I know you'll probably never forgive me, but I am sorry on that. . . . Looking backwards, I would have done things differently. . . . If I had a time machine today, I'd

more or less invited a damage award of the magnitude of the one actually returned.

The State argues the trial court's finding that it "invited" the high damage award is evidence that the award is punitive in nature. The State implies that Vetter's lack of medical treatment for his emotional distress is further indication that the jury's award was excessive.

The evidence shows that Vetter, who was sixty-four years old at the time of trial, had worked full-time for the DNR for more than thirty-six years before his termination. Vetter testified that he loved his job, stating:

> Well, I love growing the trees and the satisfaction of treating the seed and seeing them grow out in the field and knowing you had accomplished growing, you had a good crop for the year, and then the maintenance of equipment.
> I took a lot of pride in the painting of all the tractors and the equipment and building new things to make our job easier and better.

On the day he was terminated, Vetter's supervisor confiscated Vetter's keys, took Vetter's work identification, and escorted Vetter to his car. Vetter told the jury this made him feel "[l]ike I was a criminal who had done something wrong." As he walked to his car, Vetter who was "[s]till in shock and not understanding what was going on," asked the supervisor if the DNR had considered the impact his firing would have on the nursery; the supervisor replied, "Nobody cares." Although Vetter "held on to the silly hope that [he] was really needed" at the

---

go back and fix things." This is reminiscent of the response Frank Shirley (played by Brian Doyle-Murray) gave after Clark Griswold (played by Chevy Chase) chastised Shirley for cancelling his employees' Christmas bonuses: "Sometimes things look good on paper, but lose their luster when you see how it affects real folks." *National Lampoon's Christmas Vacation* (Warner Bros. 1989).

nursery, he was never reinstated. Vetter further explained to the jury how his termination affected him:

> Seemed like I had worn out my usefulness, self-esteem took a hit, felt like I . . . just couldn't do my job.
>
> Q. Have you questioned your worth since you were fired? A. Yes, I did. Yes, I have.
>
> Q. Can you tell us about that? A. Struggled with feeling whether I knew what I was really doing and just, you know, working on the cars and my hobby and things like that. I questioned my abilities.
>
> Q. Were you an insecure person before your termination? A. Not at all.
>
> Q. Did you feel like the State, DNR, the defendants in this case, have labeled you incapable? A. Yes. That's exactly what I felt.
>
> Q. What effect does that have on you? . . . Currently how has it felt over the two years since you've been fired? A. It's taken me quite a while to get back into my hobby. And, actually, I'm starting back into it now, and I'm participating in it more.
>
> Q. Why did it take you a while to get back into it? A. Several reasons. Because everybody knew me in the community and I'd been fired, I had a hard time facing people. I just was embarrassed, kind of felt humiliated. I really struggled with facing these same people that I had for [thirty-six] years.
>
> Q. How long do you think you could have continued to do your job at the state forest nursery at a high level? A. The high level that I was doing, I felt that I could have continued all the way until I wanted to retire. I did not see any issues.
>
> Q. How often do you think about the circumstances surrounding your termination? A. I'd say almost daily.
>
> Q. And when you have those thoughts, how do you feel? A. I'm hurt. I'm very hurt, and I will add in anger. I'm very upset with the State for treating me that way.
>
> Q. What has been the very worst moment of this whole ordeal for you? A. Other than May 17, having to relive this all over again.
>
> Q. The jury might be wondering if you're here because you're bitter. Why have you pursued this lawsuit? A. Truthfully, I've pursued this because I feel that what the State did to me was wrong.
>
> You shouldn't be allowed to treat people that have given blood, sweat, and tears to their career for [thirty-six] years and then just kick them out the door. I don't feel that's right nor should it be allowed.

Q. John, will you look at Exhibit 10, page 9? It's the last page. This was the document Aron Flickinger created regarding work duties at the nursery.

Mr. Flickinger writes, "Our customers are not cold statistics. They are human beings with feelings, moods, and emotions like our own."

When you read that and think about it, what does that make you think? A. Neither are the people that work there. They're human beings with feelings, moods, and emotions. We're not just another statistic.

Q. Do you feel like in this case you were treated like a cold statistic? A. Yes, on a piece of paper. That was it. Just words on a piece of paper led to my being fired.

Q. How did that make you feel after [thirty-six] years of service to be treated like a cold statistic? A. Cheated, because I don't feel I was given a fair shake. I don't feel that the State acted honestly in how they treated me.

Vetter's son, Aaron, also testified extensively about the effect that Vetter's termination had on his emotional state. Aaron told the jury that Vetter loved working for the DNR, loved the work he did, and was passionate about his job. When Vetter called Aaron and told him he had been terminated, Vetter was in shock and Aaron initially "thought by the way that he was acting that somebody might have passed." Aaron testified that Vetter "just couldn't believe it. And what's worse is that he didn't understand it." When Aaron saw Vetter later in the week, "he walked around sort of like a ghost for a bit there and really just unsure and sick." Vetter withdrew from his family. Aaron testified that he believes the way Vetter's career with the DNR ended has tainted the thirty-six years Vetter worked for the DNR. Aaron observed Vetter's emotional pain manifest physically, testifying, "I've seen him cry. I've heard him choke up over the phone when this first happened. I've seen him lose weight. . . . I know that he had struggled with his appetite for the longest time. Those are the things that I noticed." Vetter's termination also affected his ability to sleep, and Aaron opined

that being terminated was one of the most difficult things Vetter, a veteran of the Vietnam War, had been through. Aaron characterized Vetter's termination after three decades of working for the State as "a slap in the face."

Vetter's wife, Carol, also testified about the toll Vetter's termination took on him. Carol explained that Vetter took a lot of pride in the work he did for the DNR and that his job was "his life. He was so proud of the tree nursery. That was his baby." Vetter even took Carol to the nursery after hours on their second date to show her around. When Vetter told Carol he had been fired, she could tell by "[h]is voice, the way he tried to compose himself to talk," that Vetter was "in total shock and disbelief, very, very upset." She observed that it took Vetter "some time" for the reality of the situation to sink in, and that the following months were difficult for him because he "gave his whole heart to his job and [was] just told to leave." Vetter ran through the termination scenario in his mind many times a day for approximately six months, and it still played through his mind at the time of trial. She believed the hurt and pain will continue for the rest of his life.

Considering the length of Vetter's employment with the DNR, his age and employability, his passion for his job, and the toll his termination has taken on his emotional and physical health, a larger award of emotional distress damages is warranted. We disagree with the State's characterization of the damage award as excessive. The State failed to show the award was influenced by passion or prejudice. On this basis, the trial court was within its discretion to deny the State's motion for new trial based on the damage award, and we affirm.

**V. Litigation Expenses.**

On cross-appeal, Vetter challenges the trial court's denial of his request to be awarded litigation expenses. We review this claim for an abuse of discretion. *See Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 897 (Iowa 1990).

The trial court ordered Vetter be reimbursed for the cost of filing the petition and serving it on the defendants, the standard witness fee and additional compensation for his expert witness's testimony at trial, and the fee paid to an expert witness for his discovery deposition. However, it denied Vetter's request that he be reimbursed for the costs of scanning, copying, printing, electronic research, long-distance phone charges, mileage, postage, meals, and parking. Vetter argues the trial court abused its discretion in denying recovery of these expenses because it mistakenly believed it did not have the authority to award him these expenses.

In denying these expenses, the trial court held that "only expenses for which reimbursement is available are those for which reimbursement is specifically authorized by statute or rule." However, the ICRA provides that a plaintiff who brings a successful claim under the ICRA may recover damages, which "shall include *but are not limited to* actual damages, court costs and reasonable attorney fees." Iowa Code § 216.15(9)(a)(8) (emphasis added). The ICRA's federal counterparts have been interpreted to allow recovery of "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee paying client" as attorney fees. *Sturgill v. UPS, Inc.*, 512 F.3d 1024, 1036 (8th Cir. 2008) (citation omitted) (concluding this rule is consistent with United States Supreme Court precedent).

A court abuses its discretion when it fails to exercise any discretion. *See MC Holdings, L.L.C. v. Davis Cty. Bd. of Rev.*, 830 N.W.2d 325, 331 (Iowa 2013). Because the trial court had the ability to award the litigation expenses Vetter requested and erroneously believed it was unable to award these expenses, it failed to exercise its discretion. Therefore, the trial court abused its discretion in denying Vetter's request for an award of expenses for scanning, copying, printing, electronic research, long-distance phone charges, mileage, postage, meals, and parking. Accordingly, we reverse the denial of these litigation expenses and remand to the district court to determine whether to award these expenses as part of Vetter's attorney fees. On remand, the court should also consider the amount of attorney fees, costs, and expenses necessitated by this appeal. *See Landals*, 454 N.W.2d at 898-99 (holding that to the extent a plaintiff in an age discrimination case brought under the ICRA "was entitled to an award of attorney fees for his litigation expense before the district court, he is likewise entitled to an award of fees necessitated by this appeal" and "remand[ing] to the district court for hearing on [plaintiff]'s motion for appellate attorney fees and costs").

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Tabor, J., concurs; McDonald, J., dissents.

**MCDONALD, Judge.** (dissenting)

The defendants incompetently managed Vetter's work restrictions and callously terminated Vetter's employment. The jury was angry. It punished the defendants. I am tempted to concur in the majority opinion on the ground the defendants received their just deserts, karmic justice was achieved. Except karmic justice is not a legal reason. Legal reasons compel me to respectfully dissent.

I.

To establish his claim under the Iowa Civil Rights Act Vetter was required to establish as a threshold matter he had a "disability" within the meaning of the act. *See Schlitzer v. Univ. of Iowa Hosp. & Clinics*, 641 N.W.2d 525, 530 (Iowa 2002) (setting forth prima facie case); *see also Christian v. St. Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1053 (7th Cir. 1997) ("The [ADA] is not a general protection of medically afflicted persons. . . . If the employer discriminates against them on account of their being (or being believed by him to be) ill, even permanently ill, but not disabled, there is no violation."); *Bray v. Nat'l Servs. Indus., Inc.*, 209 F. Supp. 2d 1343, 1350 (M.D. Ga. 2001) ("To complete such an analysis, however, it is necessary first to determine whether an impairment, either actual or perceived, would constitute a disability under the ADA.").

The ICRA defines "disability" as "the physical or mental condition of a person which constitutes a substantial disability." Iowa Code § 216.2(5) (2013). This required Vetter to prove he had "a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment." Iowa Admin. Code r.

161-8.26(1); *see also Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 n.1 (Iowa 2014) (interpreting rule 161-8.26 to "provide the relevant definition of those persons covered by the ICRA"). The term "physical or mental impairment" means

> a. Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or
> b. Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

Iowa Admin. Code r. 161-8.26(2). The "term 'major life activities' means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* r. 161-8.26(3). The impairment and corresponding limitation or limitations must be more than transitory. *See Vincent v. Four M Paper Corp.*, 589 N.W.2d 55, 62 (Iowa 1999).

Even when the evidence is viewed in the light most favorable to the jury's verdict, there is not substantial evidence Vetter was actually disabled. Vetter suffered no long-term impairment or substantial limitation of a major life activity. *See Bray*, 209 F. Supp. 2d at 1351 ("It is well-recognized that temporary injuries or impairments are not generally recognized as constituting substantially limiting conditions for purposes of showing a disability."). Vetter suffered an acute work-related back injury in 2011. His physical capabilities were limited following the injury. Vetter then underwent surgery and post-surgical rehabilitation. Vetter testified he "was very pleased" with his surgery and rehabilitation. Vetter returned to work in February 2012 without restrictions. Vetter admitted he

returned to work and performed all of the functions of his physically demanding job. Vetter's counsel asked him if he was "ever unable" to "to work outdoors and withstand physically demanding work such as stooping, bending, and routinely lifting up to [fifty] pounds." Vetter answered "No, not at all." It was only in January 2013—after Vetter had been working without restrictions for almost one year—that Vetter was issued work restrictions. The work restrictions were issued after a functional capacity evaluation performed for workers' compensation purposes, but the restrictions did not bear any relationship to Vetter's actual physical condition. Vetter testified he did not pay attention to the restrictions because they were not of "any value." He testified he "had been able to do [his] job for the last year" and did not need any restrictions.

Vetter's counsel recognized this glaring legal problem in Vetter's claim. During closing argument, Vetter's counsel argued the jury could find Vetter was disabled if he was impaired and substantially limited in 2011, even if the impairment and substantial limitation had been resolved by 2013:

> But the reason we focus on 2011 . . . . is . . . the fact that you need to think about the condition without the helpful effects of mitigating measures such as—and we know he had surgery, we know he had physical therapy, we know he had injections. So 2011 was when it was at its worst. And you also have to consider that in determining whether or not he's disabled.

Vetter contends this was proper because, in determining whether the plaintiff was disabled, the jury should not have considered mitigating measures, like surgery, that improved Vetter's physical condition. Vetter's argument is unavailing. As above noted, it is well established a temporary impairment is not a disability within the meaning of the act. In addition, Vetter fails to distinguish

between mitigating measures that ameliorate any limitation or limitations caused by a physical impairment (e.g., corrective lenses, hearing aids, and, in some circumstances, surgery) and mitigating measures that resolve the impairment. The law is well established that an employee who suffers an acute impairment, who undergoes surgery or treatment to resolve the resulting impairment, and who is able to recover without significant restriction is not "disabled" within the meaning of the act. *See, e.g., Troeger v. Ellenville Cent. Sch. Dist.*, 523 F. App'x 848, 852 (2d Cir. 2013) (holding plaintiff was not disabled where he suffered an injury, had surgery, and recovered such that he had no significant restrictions other than a lifting restriction of twenty pounds); *Heintzelman v. Runyon*, 120 F.3d 143, 145 (8th Cir. 1997) (stating an *"*asserted inability to work while recovering from surgery is simply not evidence of a permanent impairment"); *McDonald v. Pennsylvania, Dep't of Pub. Welfare*, 62 F.3d 92, 96–97 (3d Cir. 1995) (holding that recuperation after abdominal surgery is not a disability); *Evans v. City of Dallas*, 861 F.2d 846, 852–53 (5th Cir. 1988) (holding knee injury that required surgery where there was recovery did not result in a disability); *Huskins v. Pepsi Cola*, 180 F.Supp. 2d 347, 351–52 (N.D.N.Y.2001) (holding an employee who had a shoulder injury that prevented him from performing his job duties for five months was not disabled under the ADA); *Hutchinson v. United Parcel Serv., Inc.*, 883 F. Supp. 379, 396 (N.D. Iowa 1995) (holding employee was not disabled where employee suffered non-minor injuries but "the medical record demonstrates that they were temporary, and that any permanent impairment is only slight"); *Maloney v. Barberton Citizens Hosp.*, 672 N.E.2d 223, 225 (Ohio Ct. App. 1996) (interpreting Ohio law and concluding plaintiff was not

"handicapped" within the meaning of discrimination law where "plaintiff's back injury was a transitory injury, which caused her pain and inconvenience for a definite period of time, but which had no adverse residual effects"); *Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 845 (Tenn. Ct. App. 2009) (holding employee who underwent neck-fusion surgery to address neck and arm pain was not disabled within meaning of Tennessee act where employee fully recovered, was able to return to work, and was physically active at home). Stated another way, Vetter had no physical impairment during the relevant time period and thus, as a matter of law, was not disabled.

Even assuming the surgery and rehabilitation did not fully resolve Vetter's physical impairment, the physical impairment did not "substantially limit" Vetter in one or more major life activities. During closing argument, Vetter's counsel told the jury "when those physical restrictions were given . . . he's disabled as a matter of law." That is incorrect. The argument fails to distinguish between a physical impairment, a work restriction, and a disability. *See Pryor v. Trane Co.*, 138 F.3d 1024, 1028 (5th Cir. 1998) ("[T]he mere fact that Pryor had work restrictions did not require the jury to find that she had a disability that substantially limited a major life activity."); *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 199 (D. Conn. 2013) ("However, the terms 'impairment' and 'disability' are not equivalent; for an individual to be disabled he must show that the impairment substantially limits a major life activity . . . ."); *Jones v. Walgreen Co.*, 765 F. Supp. 2d 100, 109–10 (D. Mass. 2011) ("Particularly important here is the distinction that Plaintiff has failed to draw between her disability and her restrictions. Plaintiff contends that she was wrongfully terminated because of her

*disability*. Defendant Walgreen freely admits that she was terminated because of her *restrictions.* Plaintiff has conflated her disability and her restrictions, overlooking the fact that an employer may base a decision that the employee cannot perform an essential function on an employee's actual limitations, even when those limitations result from a disability." (emphasis in original) (internal quotation omitted)). While work restrictions might evidence a limitation caused by a physical impairment, it is not the case that work restrictions establish a disability as a matter of law.

The work restrictions in this case do not establish Vetter was substantially limited in a major life activity. First, the restrictions did not correspond to Vetter's actual physical condition. Because Vetter filed a workers' compensation claim, the workers' compensation claim administrator had Vetter undergo a functional capacity evaluation in September 2012. Vetter testified he did not understand the purpose of the evaluation because he was better by the time of the evaluation. Vetter testified he did not pay attention to the evaluation or the subsequent restrictions because they were not of "any value." He testified he had been able to do the job for the last year. In fact, when the consultant came and asked whether Vetter actually needed accommodations in performing his job, Vetter said, "I told him that there was nothing that I could think of I needed; I was fine and was able to do my job." Second, and more important, the restrictions imposed in this case have been found, as a matter of law, to not constitute a substantial limitation on one or more major life activities. *See Hansen v. Seabee Corp.*, 688 N.W.2d 234, 242 (Iowa 2004) (holding lifting restriction was not a substantial limitation of a major life activity); *See, e.g.,*

*Gretillat v. Care Initiatives*, 481 F.3d 649, 654 (8th Cir. 2007) (holding impairment that limited crawling, kneeling, crouching and squatting was not a disability); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 990 (N.D. Iowa 2004) (lifting restriction and minor impairments, even when considered cumulatively, do not constitute a substantial limitation on a major life activity); *Miller v. Airborne Express*, No. 3:98-CV-0217-R, 1999 WL 47242, at *4 (N.D. Tex. Jan. 22, 1999) (stating squatting does not constitute a major life activity). In addition, Vetter did not produce evidence his purported limitations actually "prevent[ed] or severely restrict[ed] [him] from doing the set of activities that are 'of central importance to most people's daily lives.'" *Nuzum v. Ozark Auto. Distrib., Inc.*, 432 F.3d 839, 846 (8th Cir. 2005) (quoting *Toyota Motor Mfg. v. Williams*, 534 U.S. 184,198 (2002)).

We must always evaluate impairments on an individual basis, which requires an assessment of the actual impairment, the actual limitations caused by the impairment, and whether the purported limitations severely restrict the plaintiff in the activities of daily living. *See Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 952 (7th Cir. 2000). Conclusory statements regarding the plaintiff's condition that merely mimic the relevant legal standard are insufficient to establish a disability. *See Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 598–99 (6th Cir.1999)*, Evers v. Gen. Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985) ("Conclusory allegations without specific supporting facts have no probative value."). Instead, the disability determination must be "based on the effect of the impairment in [the plaintiff's] life." *Hinojasa v. Jostens Inc.*, 128 F. App'x 364, 367 (5th Cir. 2005).

There is nothing in this record to suggest that Vetter had an actual impairment in 2013, that the impairment actually limited him in any significant way, or that the purported limitation impacted any activity of central importance in his daily life. Ryan Schlatter worked as a fire prevention specialist at the nursery since 1999. He was friends with Vetter and saw Vetter at work almost every day. He testified Vetter "looked like he was doing everything he had done before the back injury." He also testified the "back injury did not really affect his ability to do his job." Schlatter also testified the back injury did not limit Vetter outside work. Vetter rebuilt and restored antique cars and hot rods. According to Schlatter, this was physical work. Vetter did this before and after the back surgery.

Kevin Barker worked with Vetter on a daily basis for eighteen years. He testified Vetter could do all of the physical work the job required. He testified Vetter could walk without limitation. He testified Vetter had no issue standing on his feet for a long period of time. He testified Vetter was able to get down underneath vehicles and do work. Plaintiff's counsel asked Barker, "In the last [eighteen] years you worked by this man, had anything changed in that last year that you somehow thought he couldn't do the job?" Barker answered, "No. He could do the job." Beyond the job, Barker testified there was not "anything that [Vetter] did not do or could not do after his injury that he did before."

Similarly, Aaron Wright saw Vetter on a daily basis and testified there was no physical job duties Vetter was unable to perform. He testified Vetter maintained the equipment and machines. He testified Vetter lifted and helped others lift things. Vetter operated a forklift. "He was able to complete all his job duties in the year before he left the Department of Natural Resources."

Vetter confirmed his coworkers' assessment regarding the lack of any permanent impairment and the lack of any actual limitation. He did not need help lifting. In fact, he testified he actually "help[ed] people lift things even after [his] injury." He was able to climb. When asked whether, "it was difficult for you to climb into a tractor," Vetter replied, "No, not at all." He was also asked, "Do you think you grimaced when climbing into a tractor," and he answered, "No." He testified he was able to drive vehicles over bumpy terrain. He testified he could climb ladders. He testified his injury did not prevent him from collecting seeds, walking, reaching, and bending. He was able to get on the ground or sit without assistance. He was able to get under equipment to work on it. He did it "all the time." He testified he was able to twist and rotate.

The fact Vetter had no permanent impairment and no permanent limitation was evidenced by the very physical work he performed. After recovering from surgery, Vetter performed manual tasks at work. He continued to repair heavy machinery. He put a clutch into a tractor. He rebuilt a seeder. He repaired a lawnmower, which required pulling off the deck and replacing the bearing and blades. He rebuilt motors, transmissions, and other hydraulic equipment. He continued to fabricate heavy equipment and tools for the nursery. He built a protective cage for a battery charger, which required him to cut steel and weld it together. He testified he maintained the "nursery grounds, fence, windbreaks, and parking lots." He trimmed windbreaks back where there were overhanging branches. Vetter testified this was physical work. He "ran the chainsaw and drove the tractor and loaded the branches." He "stocked cleaning supplies and organized the cleaning room." After his injury, he removed and regraded a field.

Vetter "[ran] the bulldozer and [took] out the trees and cut them off and hauled them off to the dump or drug them down to the brush pile for disposal." After doing that he "went in with a tiller and did seed bed prep."

There is also no evidence Vetter was limited outside the workplace. Vetter testified he is not a couch potato. He still works on his antique cars, and he helps others do the same. He is an avid boater. He also has ridden RAGBRAI in the past and testified he was training to ride it again. RAGBRAI is a week-long bicycle ride across the state of Iowa. Vetter did not introduce any evidence of a limitation of any major life activity outside the workplace.

This is not simply a case in which Vetter could perform the essential functions of the job despite his disability. Here, the essential functions of the job were physical in nature. The fact that Vetter was able to perform them shows not only that he could perform the essential functions of the job but also that he had no impairment and that he was not physically limited in any way, let alone substantially limited.

I understand why the jury reached the verdict it did. The jury was mad at the defendant's treatment of a long-time, loyal employee. Rightfully so. However, the Iowa Civil Rights Act does not create a cause of action for employees wronged by inept managers. The purpose of the act is to prevent employment discrimination against the "disabled." There is not substantial evidence Vetter was disabled within the meaning of the act. I would vacate the judgment entered in favor of the plaintiff and remand this matter for dismissal.

II.

Even assuming there was substantial evidence in support of the jury's verdict, I would still vacate the judgment and remand this matter for new trial due to prejudicial instructional error. Claims of instructional error are reviewed for the correction of errors at law. *See Alcala v. Marriott Int'l Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).

The defendants first challenge the pretext instruction the court gave to the jury. With respect to claimed error in an instruction given, error will not warrant reversal unless the objecting party has been prejudiced. *See Kurth v. Iowa Dep't of Transp.*, 628 N.W.2d 1, 5 (Iowa 2001). Prejudicial error occurs when an instruction materially misstates the law, confuses or misleads the jury, or is unduly emphasized. *See Anderson v. Webster City Cmty. Sch. Dist.*, 620 N.W.2d 263, 268 (Iowa 2000). Instructions that comment on the evidence or the weight to be given to the evidence are improper and prejudicial. *See Peters by Peters v. Vander Kooi*, 494 N.W.2d 708, 712–13 (Iowa 1993).

In this case, the district court gave the jury a modified pretext instruction. As a general rule, trial courts have the discretion to modify or rephrase approved or uniform instructions "to meet the precise demands of each case as long as the instructions fully and fairly embody the issues and applicable law." *Sumpter v. City of Moulton*, 519 N.W.2d 427, 434 (Iowa Ct. App. 1994) (citing *Norton v. Adair Cty.*, 441 N.W.2d 347, 358 (Iowa 1989)). In *Deboom v. Raining Rose*, the supreme court held the following pretext instruction was a correct statement of the law:

> You may find that plaintiff's sex was a motivating factor in defendant's decision to terminate if it has been proved by the preponderance of the evidence that defendant's stated reasons for its decision are not the real reason, but are a pretext to hide sex discrimination.

772 N.W.2d 1, 9 (Iowa 2009). The district court modified this instruction to also add, "If you find that Defendants' justification for refusing to provide Plaintiff with an accommodation or for terminating him is not true, *discrimination may be the most likely alternative explanation.*" (emphasis added.) The instruction went on, stating, "This may be especially so, since Defendants are in the best position to put forth the actual reasons for their decision."

The district court's additional instructions were an improper comment on the evidence. Here, the district court correctly instructed the jury it could infer discriminatory intent if it found the defendants' stated reasons for terminating Vetter's employment were false. However, the instruction went further and told the jury discrimination may be "the most likely" inference to be drawn from the evidence and further explained why discriminatory intent may be "the most likely" inference to be drawn. In short, the district court's modified instruction, rather than informing the jury it *may draw* an inference of discrimination from certain evidence, instructed the jury it *should draw* an inference of discrimination because it was "the most likely" explanation of the defendants' conduct.

The defendants also contend the district court erred in refusing to give the defendants' requested instruction on the business judgment rule. The requested instruction provided:

> An employer is free to terminate an employee's employment for any nondiscriminatory reason even if its business judgment seems objectively unwise. Therefore, you may not return a verdict for

Plaintiff just because you might disagree with Defendants' actions or believe them to be harsh or unreasonable.

It is reversible error to decline to give an instruction where it correctly states the law, has application to the case, and is not stated elsewhere in the instructions. *See Deboom*, 772 N.W2.d at 5. I conclude the district court erred in refusing to give the requested instruction.

Federal courts have adopted the instruction for use in employment discrimination cases. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir. 1979) (stating "[t]he court should also . . . explain that an employer is entitled to make its own subjective business judgments, however misguided they appear to the jury, and to fire an employee for any reason that is not discriminatory"). The First, Third, Eighth, and Eleventh Circuits have model instructions for the business judgment rule to be used in employment discrimination cases, including disability cases. The Federal Jury Practice and Instructions includes a model instruction, stating "In determining whether defendant's stated reason for its actions was a pretext for discrimination, you may not question defendant's business judgment. Pretext is not established just because you disagree with the business judgment of defendant [name], unless you find that defendant's reason was a pretext for discrimination." 3C Fed. Jury Prac. & Instr. § 171:75 (6th ed.).

While our supreme court has not explicitly approved an instruction for the business judgment rule to be used in cases arising under the Iowa Civil Rights Act, it has affirmed the employer is entitled to exercise business judgment in addressing personnel matters. *See Farmland Foods Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 743 (Iowa 2003) (noting the employer's right to

exercise "business judgment and expertise"); *Woodbury County v. Iowa Civil Rights Comm'n*, 335 N.W.2d 161, 167 (Iowa 1983) ("An employer is entitled to make his own policy and business judgments, and may, for example, fire an adequate employee if his reason is to hire one who will be even better, as long as this is not a pretext for discrimination." (quoting *Loeb*, 600 F.2d at 1012 n.6)). This leads me to conclude the business judgment rule is a correct statement of the law in Iowa. This also leads me to conclude the district court should have given the instruction and erred in declining to do so. *See, e.g., Walker v. AT & T Tech.*, 995 F.2d 846, 849–50 (8th Cir. 1993) ("AT & T's proposed instruction states the substantive law that an employer has the right to make business decisions—to assign work, to change an employee's duties, to refuse to assign a particular job, and to discharge—for good reason, bad reason, or no reason at all, absent intentional age discrimination. The court did not instruct the jury that an employer had a right to make such business decisions. . . . the district court erred.").

III.

For the foregoing reasons, I respectfully dissent.